1

2                        UNITED STATES DISTRICT COURT

3                        WESTERN DISTRICT OF NEW YORK

4

5

6       - - - - - - - - - - - - - - X
        UNITED STATES OF AMERICA    )    14CR6045
7                                   )
        vs.
8                                      Rochester, New York
        RONNIE PARKER,                 February 3, 2015
9              Defendant.              1:30 p.m.
        - - - - - - - - - - - - - - X
10      **Evidentiary Hearing**
        **Transcribed from an Electronic Recording Proceeding**
11

12                       TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE MARIAN W. PAYSON
13                  UNITED STATES MAGISTRATE JUDGE

14

15

16                       WILLIAM J. HOCHUL, JR., ESQ.
                         United States Attorney
                         BY: CRAIG GESTRING, ESQ.
17                       Assistant United States Attorney
                         6200 Federal Building
18                       Rochester, New York 14614

19

20                       MARIANNE MARIANO, ESQ.
                         Federal Public Defender
                         BY: STEVEN SLAWINSKI, ESQ.
21                       Assistant Federal Public Defender
                         28 East Main Street, Suite 400
22                       Rochester, New York 14614
                         Appearing on behalf of the Defendant
23

24      COURT REPORTER:   Karen J. Bush, Official Court Reporter
                          (585) 613-4312
25                        100 State Street
                          Rochester, New York 14614

2

```
 1                        USA VS. R. PARKER

 2                              I N D E X

 3   WITNESS FOR
     THE DEFENDANT        DX         CX      RDX      RCX
 4
     D. Landy              4         37       57       87
 5
     C. Dean              67         77       81       82
 6

 7


 8
     EXHIBIT       RECEIVED
 9
     A   Doctor's note  36
10   B   Doctor's note  36
     C   Doctor's note  36
11
     1-A Photograph      43
12   1-B Photograph      43
     1-C Photograph      43
13   1-D Photograph      43
     1-E Photograph      43
14

15                     P R O C E E D I N G S

16                  *          *          *

17


18


19


20          THE CLERK:  United States of America versus Ronnie

21   Parker, 14CR6045.

22          MAGISTRATE JUDGE PAYSON:  All right.  I appreciate

23   everybody's accommodation.  This hearing was scheduled to

24   commence -- well, I think it was originally scheduled to

25   commence today at 1:30, and then I received a letter from Mr.
```

1                        USA VS. R. PARKER

2    Gestring indicating that his witness, Agent Blackerby, was not

3    available this afternoon.  So we put it on for this morning --

4    right?  You're looking at me.

5                   MR. GESTRING:  Correct, that's accurate.

6                   MAGISTRATE JUDGE PAYSON:  And then I was out of

7    town for the weekend, and due to the snowstorm yesterday, my

8    flight was cancelled.  So I apologize for not being able to --

9    and I just landed, so -- so, here we are.  Thank you.  And

10   we'll proceed with Mr. Slawinski's witnesses this afternoon.

11   And then when we're done, we'll find a date in the next,

12   hopefully, couple of days to accommodate Agent Blackerby.

13                  MR. SLAWINSKI:  Sounds good to me, Judge.

14                  MR. GESTRING:  Thank you, your Honor.

15                  MR. SLAWINSKI:  My first witness will be Dr.

16   Douglas Landy.  Douglas Landy.

17                  MAGISTRATE JUDGE PAYSON:  Dr. Landy, please step

18   forward here to be sworn.

19   (D. Landy was called to the witness stand and sworn.)

20                  THE CLERK:  Thank you.  Please be seated.

21                  MAGISTRATE JUDGE PAYSON:  Right here.

22                  THE CLERK:  When you are seated, please state your

23   full name and spell your last name for the record.

24                  THE WITNESS:  Can I put my jacket over here?

25                  MAGISTRATE JUDGE PAYSON:  You can put your jacket

```
 1                    D. LANDY - DX BY MR. SLAWINSKI
 2     right there.
 3                    THE WITNESS:  Douglas A. Landy, M.D.
 4                    MAGISTRATE JUDGE PAYSON:  How are you, Dr. Landy?
 5                    THE WITNESS:  Good, thank you.
 6                    MAGISTRATE JUDGE PAYSON:  Good.  I notice that you
 7     brought some materials in.  If you could just put them
 8     facedown.  If you need to refer to them, you'll let Mr.
 9     Slawinski know and he can deal with that.
10                    Okay.  Hold on one second.  Okay.  Can you -- seem
11     to be working?  Okay.  All right.  Dr. Landy, would you state
12     your name for the record again.
13                    THE WITNESS:  Douglas A. Landy, M.D.
14                    MAGISTRATE JUDGE PAYSON:  Okay.  Thank you.  Mr.
15     Slawinski, you may proceed.
16     DIRECT EXAMINATION BY MR. SLAWINSKI:
17       Q.   Dr. Landy, you're the same person that testified
18     earlier at a hearing in this case telephonically?
19       A.   Yes.
20       Q.   Okay.  And you are a medical doctor?
21       A.   I am.
22       Q.   Where did you graduate from medical school?
23       A.   Hahnemann -- that's H-a-h-n-e-m-a-n-n -- University.
24       Q.   In Philadelphia?
25       A.   Yes.
```

```
 1                    D. LANDY - DX BY MR. SLAWINSKI

 2        Q.   And when did you graduate from medical school?

 3        A.   1983.

 4        Q.   And how long have you been practicing medicine?

 5        A.   Well really, since then, since 1983.

 6        Q.   As a psychiatrist?

 7        A.   As a psychiatrist since 1987.

 8        Q.   So you've been practicing as a psychiatrist since then,

 9   correct?

10        A.   Correct.

11        Q.   And how long have you been a psychiatrist at Clifton

12   Springs Hospital?

13        A.   Three years.

14        Q.   Okay.  And what are your duties at Clifton Springs?

15        A.   My duties are primarily to take care of patients on the

16   in-patient psychiatric unit, as well as see patients in the

17   Emergency Department and to do psychiatric consultations.

18        Q.   And is the in-patient psychiatric ward at Clifton

19   Springs, is that a large ward?

20        A.   No.

21        Q.   How many people are usually patients there?

22        A.   Up to 12.

23        Q.   Okay.  And how do you know Ronnie Parker?

24        A.   I've taken care of him twice in the hospital.

25        Q.   And when were those dates?
```

1                    D. LANDY - DX BY MR. SLAWINSKI

2        A.    I don't remember the first time.  The second time was

3    back in February or March in 2014.

4        Q.    So, that was February or March last year?

5        A.    Yes.

6        Q.    Okay.  And I want to draw you to that time frame.  Do

7    you remember the date that Mr. Parker was admitted to Clifton

8    Springs?

9        A.    I have that information, if I can look at --

10        Q.    If you want to refer to your notes, thanks, you may.

11                    MAGISTRATE JUDGE PAYSON:  Do you want to mark

12    those, Mr. Slawinski?

13                    MR. SLAWINSKI:  I have -- well, your Honor, I have

14    the Clifton Springs -- I have exhibits ready.  Perhaps we

15    should get that done.

16                    MAGISTRATE JUDGE PAYSON:  I think so.  It's

17    probably easier.

18                    MR. SLAWINSKI:  I have my exhibits, and I told Mr.

19    Gestring that my first exhibit is going to be Exhibit A, which

20    was attached to the motion.  So I'll have Dr. Landy refer to

21    that.  This is the treatment notes from Clifton Springs

22    Hospital.

23        Q.    You can take a look at that, Doctor.

24        A.    Yes.  He was admitted on February 5th, 2015 -- 2014,

25    excuse me.

```
 1                  D. LANDY - DX BY MR. SLAWINSKI

 2        Q.   Okay.  And why was he admitted?

 3        A.   He had been brought to the emergency room because of

 4   increasing psychosis.  He was having increasing auditory

 5   hallucinations, which was scaring him and bothering him.  And

 6   he didn't like the way it made him feel, so he came to the

 7   hospital to get some help with it.

 8        Q.   Okay.  Was he --

 9                  MAGISTRATE JUDGE PAYSON:  You said auditory --

10   what did you say?

11                  THE WITNESS:  Auditory and visual hallucinations.

12                  MAGISTRATE JUDGE PAYSON:  Hallucinations.  Thank

13   you.

14        Q.   And those auditory and visual hallucinations, those

15   were a symptom of his schizophrenia?

16        A.   Yes, they were.

17        Q.   Okay.  Previously, you had said that you treated Mr.

18   Parker.  You also treated him for schizophrenia, correct?

19        A.   That is my recollection, yes.

20        Q.   Okay.  So he arrived on -- I'm sorry -- February 5th,

21   complaining of auditory and visual hallucinations, correct?

22        A.   Correct.

23        Q.   Okay.  And then you proceeded to admit him?

24        A.   Yes, I did.

25        Q.   Okay.  And when you admitted him, did he self-report
```

```
 1                  D. LANDY - DX BY MR. SLAWINSKI

 2   this information to you?

 3        A.   About the hallucinations?

 4        Q.   Hallucinations.

 5        A.   Well, I asked him questions about the symptoms he was

 6   having, and he mentioned them.

 7        Q.   Okay.  He came to the hospital on his own volition,

 8   correct?

 9        A.   Yes, he did.

10        Q.   Okay.  And after you admitted him to Clifton Springs,

11   was he free to leave?

12        A.   No.

13        Q.   Why wasn't he free to leave?

14        A.   Because he was admitted on an involuntary status.

15        Q.   Okay.  And what does that mean?

16        A.   In mental hygiene law, everybody in a psychiatric unit

17   has to be on a status.  There are a couple of different kinds

18   of involuntary statuses, where the person is hospitalized so

19   they can be observed and treated, and the person is not free to

20   leave until they are discharged or until the court releases

21   them.

22        Q.   Okay.  And who makes the determination with regard to

23   discharge?

24        A.   The attending psychiatrist.

25        Q.   Okay.  And that would be you, correct?
```

```
1                    D. LANDY - DX BY MR. SLAWINSKI
2        A.   Yes, it would be.
3        Q.   Okay.  And if he wanted to leave without being
4    discharged, what would he have to do?
5        A.   He would sign a letter saying he wants to leave the
6    hospital; we would contact mental hygiene legal services, who
7    would come and talk to the patient; and if the -- if he still
8    wanted to leave and the hospital still felt that he ought to
9    stay, then we would go to the court for a retention hearing.
10       Q.   So he would have to get a court order to leave the
11   hospital if you did not give him permission to leave, correct?
12       A.   Correct.
13       Q.   Now, you said that he was suffering from delusions on
14   February 5th, correct?
15       A.   I said "hallucinations."
16       Q.   Hallucinations.  I'm sorry.  Is there a difference
17   between hallucinations and delusions?
18       A.   Yes.
19       Q.   What's the difference?
20       A.   Hallucinations are essentially a sensory perception
21   with nothing external causing the sensory perception.  So, for
22   example, hearing a voice when there isn't one, seeing things
23   that aren't there, and so forth.  Delusion is a kind of thought
24   pattern where somebody very tenaciously holds onto an idea that
25   has no basis in fact, cannot be discussed with the person.
```

1                    D. LANDY - DX BY MR. SLAWINSKI

2      They know with absolute certainty that whatever their thoughts

3      are are true.  So, for example, if somebody says, "I know that

4      the CIA is after me by the way that cloud is moving through the

5      sky," that would be a delusion.

6          Q.   Okay.  So, I guess these are two different symptoms of

7      impaired thought, correct?

8          A.   Yes.

9          Q.   Okay.  And what were Mr. Parker's hallucinations that

10     he was complaining of?

11         A.   Well, he's always had a hallucination of a person that

12     he sees, that has had different names at different times, that

13     tells him to do bad things.

14         Q.   Okay.

15         A.   So there is both a visual and an auditory component to

16     that.  And then sometimes he will see things like snakes, which

17     are obviously more of a visual hallucination.  The auditory

18     hallucinations that he hears -- sometimes people hear one

19     voice; sometimes people hear many voices.  Sometimes they can

20     identify it as belonging to somebody; sometimes they can't.  In

21     his case, the only one he identified as belonging to somebody

22     was the voice that belonged to this entity that he would see

23     sitting next to him on the bed.

24         Q.   Okay.  And what would this entity -- what was this

25     entity -- did this entity have a name?

1                  D. LANDY - DX BY MR. SLAWINSKI

2      A.   Well, he usually called it Tommy.

3                  MAGISTRATE JUDGE PAYSON:  Excuse me?

4                  THE WITNESS:  He usually called it Tommy.

5                  MAGISTRATE JUDGE PAYSON:  Tommy.

6                  THE WITNESS:  Tommy.

7                  MAGISTRATE JUDGE PAYSON:  Okay.

8                  THE WITNESS:  But during this hospitalization, he

9      occasionally called it Dallas.

10     Q.   And he had those hallucinations on the 5th of February,

11     correct?

12     A.   Yes.

13     Q.   Okay.  And what did you do during your intake process

14     with Mr. Parker to try to triage him?

15     A.   Do you mean to come up with a treatment plan?

16     Q.   Yeah.

17     A.   Okay.  Well, we talked about what was going on, and I

18     tried to assess how seriously these things were bothering him.

19     He was clearly in a good deal of distress about it.  So, his

20     medications at the time weren't -- clearly weren't helping him.

21     Q.   Do you remember what medications he was on?

22     A.   Not offhand, but they may be here.  Yeah.  He was

23     taking a medication called Prolixin.

24                 MAGISTRATE JUDGE PAYSON:  How do you spell that?

25                 THE WITNESS:  P-r-o-l-i-x-i-n.

1                    D. LANDY - DX BY MR. SLAWINSKI

2                    MAGISTRATE JUDGE PAYSON:  Thank you.

3                    THE WITNESS:  But if you look in here, it will be

4      called by its generic name, which is Fluphenazine.  I better

5      spell that, too.

6                    MAGISTRATE JUDGE PAYSON:  Yes, you better.

7                    MR. GESTRING:  Conventional spelling.

8                    THE WITNESS:  Right.  F-l-u-p-h-e-n-a-z-i-n-e.

9                    MAGISTRATE JUDGE PAYSON:  Thank you.

10     Q.    And how many milligrams of Prolixin was he on?

11     A.    At the time he came in, he was on 10 milligrams in the

12     morning and 20 milligrams in the evening.  So I increased it to

13     20 milligrams twice a day, since he had said that he had

14     responded to it in the past.

15     Q.    Okay.  And that was done on the 5th of February,

16     correct?

17     A.    Well, the 6th.  I saw him on the 6th.

18     Q.    Okay.  So, on the 6th of February, you increased the

19     Prolixin, correct?

20     A.    Right.  I also added Ativan -- A-t-i-v-a-n -- 1

21     milligram twice a day, both as an agent to help lower his

22     anxiety; and sometimes the combination of that kind of

23     medication plus an antipsychotic such as Prolixin is more

24     effective at helping hallucinations.

25     Q.    Okay.  And do either of these medications have side

```
 1                  D. LANDY - DX BY MR. SLAWINSKI
 2    effects in terms of mental cognition?
 3        A.   Yeah.  Both can cause some fuzzy-mindedness.  Sometimes
 4    people feel sluggish, and they can feel sluggish mentally with
 5    it.
 6        Q.   Okay.  So, they impair the mental process, you would
 7    say?
 8        A.   They may.
 9        Q.   Okay.
10        A.   It's not common, but it can happen.
11        Q.   Okay.  Do you know if that happened with Mr. Parker?
12        A.   I don't believe it did.
13        Q.   On what are you basing your observation on that?
14        A.   Because, over the next few days, he didn't show any
15    signs of difficulty.
16        Q.   Okay.  Now, over the next few days, did he continue to
17    have hallucinations?
18        A.   He did.
19        Q.   Okay.  And how many times did you meet with him over
20    the next few days?
21        A.   I usually meet with people at least once a day.
22        Q.   Did you meet with him on the 6th?
23        A.   Yeah.  That's when I saw him and made those
24    determinations.
25        Q.   Now, you said you gave him Ativan, correct?
```

```
 1                    D. LANDY - DX BY MR. SLAWINSKI
 2        A.   Yes.
 3        Q.   Is that the brand name for Lorazepam?
 4        A.   Yes, it is.
 5        Q.   Okay.  And that is a benzodiazepine?
 6        A.   Yes, it is.
 7        Q.   And that can impair thought functions as well, correct?
 8        A.   Correct.
 9        Q.   And one of the side effects for Ativan is making
10   somebody feel sleepy, correct?
11        A.   Correct.
12        Q.   Okay.  And are there any interactions between the
13   Ativan and the Prolixin?
14        A.   Well, if you give two medications, both can suppress
15   CNS activity.  Then, yes, you can get like a doubling of the
16   effect.
17                    MAGISTRATE JUDGE PAYSON:  What is CNS?
18                    THE WITNESS:  I'm sorry.  Central nervous system.
19        Q.   Okay.
20        A.   So, if you get one medication that can make people a
21   little foggy and another medication that can make people a
22   little foggy, you can get an additive effect of the two of them
23   together.
24        Q.   Okay.  So, it would be like drinking and taking pills
25   at the same time?  You can --
```

```
 1                    D. LANDY - DX BY MR. SLAWINSKI
 2        A.   No, I think a better example would be like drinking
 3   whiskey and then drinking rum.
 4        Q.   Okay.  So, it would make you feel doubly -- let's say
 5   "loopy," for lack of a better word, correct?
 6        A.   Yeah.  That's the technical term.
 7        Q.   So, it could impair -- one or both medications could
 8   impair somebody who's taking them, correct?
 9        A.   Correct.
10        Q.   Okay.  Now, Mr. Parker was on both medications
11   immediately before -- he started both medications, I guess, on
12   February 6th, correct?
13        A.   Correct.
14        Q.   Okay.  And on February 7th is when he had the meeting
15   with Agent Blackerby, correct?
16        A.   I don't recall the exact date.  You don't have it in
17   this.
18        Q.   I will give you what I've marked as Defendant's Exhibit
19   B, which are his treatment notes from February 7th, and change
20   out Exhibit A.
21        A.   Yes.  He did see the Secret Service agent on the 7th.
22        Q.   Okay.  And the Secret Service agent came to the
23   hospital, correct?
24        A.   He did.
25        Q.   And, at that point, Mr. Parker was not free to leave
```

```
 1                   D. LANDY - DX BY MR. SLAWINSKI
 2      the hospital?
 3          A.   No, he was not.
 4                   MR. GESTRING:   Judge, I'm going to object to the
 5      leading nature of the questions.
 6                   MAGISTRATE JUDGE PAYSON:   I'll overrule that
 7      particular objection to that particular question.
 8          Q.   Was he free to leave the hospital?
 9          A.   No, he was not.
10          Q.   And at that point, how did Mr. Parker come to -- come
11      in contact with the agent?
12          A.   When I spoke with him on the 6th, he was talking about
13      some of his ideas about killing people, because one of the
14      things we assess in terms of dangerousness is dangerousness to
15      self and dangerousness to others.   So, in terms of killing
16      people, that was there, and then he specifically mentioned
17      killing the President.   Now, I've had some experience with this
18      kind of thing before, and unless it's very, very clear that it
19      is a completely unreasonable kind of -- kind of thing, like if
20      somebody says, "I'm going to kill them by glaring at the
21      TV," we've always called the Secret Service.   I've probably
22      done this three times before in my career.   On -- I think
23      either three times before -- once, they said it didn't sound
24      like anything; twice, they came out and interviewed, said,
25      "Huh" -- you know -- "we'll just" -- sort of like -- "let us
```

1                    D. LANDY - DX BY MR. SLAWINSKI

2     know when he's discharged and take it from there" kind of

3     thing.  So I figured it would be pretty much the same kind of

4     thing, but they said, "You have to report this."

5          Q.   Who said that?

6          A.   They said that, the Secret Service.  And so I called

7     them, and they came out to interview Mr. Parker.

8          Q.   Okay.  And that happened, again, on February 7th?

9          A.   Yes.  I called them on the 6th; they came out on the

10    7th.

11         Q.   After you had spoken to Mr. Parker, you called them,

12    correct?

13         A.   Yes.

14         Q.   And they came out on the 7th, correct?

15         A.   Yes.

16         Q.   And that was a day after Mr. Parker's Prolixin and

17    Ativan had been increased and given to him, correct?

18         A.   Well, the Ativan was started; it wasn't increased.  But

19    yes, the Prolixin was increased and the Ativan was there.

20         Q.   So you began a new medication regimen the day before,

21    correct?

22         A.   Correct.

23         Q.   And about what time do you remember meeting with the

24    Secret Service?

25         A.   It was middle to late morning.

```
 1                  D. LANDY - DX BY MR. SLAWINSKI
 2      Q.   And Mr. Parker was brought in to a conference room?
 3      A.   Yes.
 4      Q.   Do you remember who brought him in there?
 5      A.   No, I do not.
 6      Q.   Were you in the conference room?
 7      A.   I was.
 8      Q.   Okay.  Who else was in the conference room?
 9      A.   Well, there was a nurse there, a unit manager, and Mr.
10   Parker and the agent.
11      Q.   And that nurse was Ms. Dean?
12      A.   Ms. Dean, yes.
13      Q.   How long did the interview with the agent last?
14      A.   Probably about an hour and a half.
15      Q.   Okay.  And do you remember if Mr. Parker was given any
16   rights warnings?
17      A.   I don't recall.
18      Q.   And during that hour and a half, was he given the --
19   was he told that he could leave?
20      A.   I don't recall.
21      Q.   Okay.  And what was the nature of the questioning
22   during that hearing?  Was it questions by Agent Blackerby?
23      A.   Yes.
24      Q.   Okay.  And did Mr. Parker respond to those questions?
25      A.   He did.
```

1                    D. LANDY - DX BY MR. SLAWINSKI

2        Q.   Okay.  And did anything surprise you during that

3    interview?

4        A.   Yes.

5        Q.   What surprised you?

6        A.   What surprised me was some of the detail, that he had

7    given thought about how he might go about executing some of his

8    ideas.

9        Q.   And why did that surprise you?

10       A.   Because before, he had just talked about how, you know,

11   he thought about killing the President, for example.  I didn't

12   ask him for any details, but when he was talking with Agent --

13   Blackerby, you said?  He gave a surprising amount of detail.

14                  MAGISTRATE JUDGE PAYSON:  I'm sorry.  When you

15   said you didn't ask him for detail, are you referring to the

16   meeting you had with him the previous day?

17                  THE WITNESS:  Yes, I am.

18                  MAGISTRATE JUDGE PAYSON:  Did you ask any

19   questions during the meeting that Mr. Parker had with Agent

20   Blackerby?

21                  THE WITNESS:  No, I did not.

22                  MAGISTRATE JUDGE PAYSON:  Thank you.

23       Q.   Did you say anything during the meeting that he had

24   with Agent Blackerby?

25       A.   No.

1                    D. LANDY - DX BY MR. SLAWINSKI

2       Q.   Do you remember Ms. Dean saying anything during the

3   meeting?

4       A.   No, I do not.

5       Q.   And you were there to observe Mr. Parker?

6       A.   I was there to observe Mr. Parker, and to give support

7   to Mr. Parker should he need it.

8       Q.   And did you have to give support to Mr. Parker?

9       A.   No.  He seemed to be doing reasonably well for most of

10  it.

11      Q.   And after the meeting was over --

12      A.   Can I go back a second?

13      Q.   Sure.

14      A.   My intention was, if it looked like Mr. Parker was

15  having difficulty, I would have terminated the meeting right

16  then and there.

17      Q.   Okay.  Were you under the impression that you could

18  terminate the meeting right then and there?

19      A.   Yeah.

20      Q.   Okay.  By Agent Blackerby?

21      A.   I told him.

22      Q.   Okay.  You told him from the outset?

23      A.   Yeah, even before, "if it looks like there's a problem,

24  we're going to have to stop."

25      Q.   Do you remember if he or anyone explained to Mr. Parker

                    D. LANDY - DX BY MR. SLAWINSKI

1
2    why he was there?

3        A.   Yes.

4        Q.   Okay.  And did that include an identification of who he

5    was?

6        A.   Yes.

7        Q.   And did that include, you know, what he was there to

8    do?

9        A.   Yes.

10       Q.   Okay.  And is it true -- during your first meeting with

11   Mr. Parker the day before, you attributed his delusions about

12   killing the President to his cocaine and substance abuse use?

13       A.   Well, I said that might be -- it might be contributory

14   --

15       Q.   Okay.

16       A.   -- but you can't say it's all that.

17       Q.   And after the meeting, you changed your thought about

18   that, correct?

19       A.   Well, I wouldn't say that.  It was substantially

20   different, yes, because usually people who are psychotic on the

21   basis of some kind of substance don't have such clear thinking,

22   ability to plan and so forth by reason -- by virtue of what the

23   drugs do to their brain.

24       Q.   And so based on the information that you got from Agent

25   Blackerby talking to Mr. Parker, you ultimately met with Mr.

1                    D. LANDY - DX BY MR. SLAWINSKI

2     Parker later that day, correct?

3          A.   Yes.

4          Q.   Okay.  And then you went over changing his medications

5     again, correct?

6          A.   Let me -- let's take a look here.  Yes.  Yes, yes, yes.

7     We did talk about changing the medication, because, apparently,

8     he was -- he had not done quite as well on Prolixin as had

9     previously been thought.

10         Q.   And what did you base your opinion on that?

11         A.   Because he said so.

12         Q.   Okay.  Did you have an opportunity to observe Mr.

13    Parker between your initial increasing the Prolixin on February

14    6th and later i the afternoon on February 7th?

15         A.   Well, I observed him in the session with the Secret

16    Service agent.

17         Q.   Okay.  And you used the -- I'm sorry.  Go ahead.

18         A.   And then I talked with him later on, so --

19         Q.   And you used both of those things to adjust his

20    medication, correct?

21         A.   Yes.

22         Q.   Okay.  So you observe Mr. Parker, and then you spoke to

23    him, and you used your observations in the meeting as well as

24    your conversation with him to put him, I guess, on another

25    antipsychotic?

```
 1                    D. LANDY - DX BY MR. SLAWINSKI
 2      A.   Yes.
 3      Q.   Okay.  And Prolixin is an antipsychotic, correct?
 4      A.   Yes, it is.
 5      Q.   Okay.  So, he was, I guess -- was he psychotic at all
 6  while he was on Prolixin for that day?
 7                 MAGISTRATE JUDGE PAYSON:  What day?
 8                 MR. SLAWINSKI:  Between the 6th and the 7th, the
 9  day of the interview.
10                 THE WITNESS:  I honestly don't know.
11      Q.   Okay.  How long does it take Prolixin to work?
12      A.   Usually, it takes a couple of days to a week or more.
13      Q.   Okay.  And is that the same if it's increased with --
14  if the dosage is increased?
15      A.   It may be, it may be quicker.
16      Q.   Okay.
17      A.   It's just a matter of having to observe and see.
18      Q.   Okay.  And how did you observe Mr. Parker during the
19  meeting with Agent Blackerby?
20      A.   During the meeting with Agent Blackerby, he appeared to
21  be doing pretty well in terms of his psychosis.  I didn't hear
22  -- there was almost no discussion about his hallucinations,
23  except talking about this entity Dallas, sometimes called
24  Tommy.
25      Q.   Okay.
```

1                   D. LANDY - DX BY MR. SLAWINSKI

2        A.   When he was talking about his thoughts about killing

3    and things he had done in that direction, there was no evidence

4    of what we call thought disorder.

5        Q.   And what's that?

6        A.   Thought disorder is an inability to proceed with

7    coherent thoughts, so that people have difficulty going from

8    topic A to topic B to topic C and so forth, but instead they

9    jump all over the place.  Another thing that you see is people

10   will go from one topic to the next based on similar sounds as

11   opposed to the subject under discussion.  Another kind of

12   thought disorder is where people get stuck on a topic and keep

13   returning to it over and over and over again, despite trying to

14   be redirected.  There was none of that.

15       Q.   During the interview, was Agent Blackerby directing the

16   questions?

17       A.   Yes.

18       Q.   Okay.  And Mr. Parker was responding to those

19   questions, correct?

20       A.   He was.

21       Q.   Okay.  How was his affect during the interview?  Did he

22   have affect --

23                   MAGISTRATE JUDGE PAYSON:  Affect?

24                   MR. SLAWINSKI:  Affect.  Sorry.

25                   THE WITNESS:  Affect, okay.

```
 1                 D. LANDY - DX BY MR. SLAWINSKI

 2        Q.   Sorry.

 3        A.   His affect was cautious.

 4        Q.   Okay.

 5        A.   I think -- he didn't seem to have any kind of a

 6   bizarreness or anything like that with his affect.  He was

 7   perhaps a bit constricted, which means that the range of how a

 8   mood goes up and down, it was almost like it was under

 9   conscious control to be careful, kind of thing.  But I didn't

10   see any significant difficulties with his affect.

11        Q.   And Agent Blackerby was asking questions about what the

12   voices were telling Mr. Parker to do?

13        A.   Yes.

14        Q.   Okay.  And Mr. Parker was answering that, correct?

15        A.   He was.

16        Q.   Okay.  And Mr. Parker's affect was cautious, you said?

17        A.   Yes.

18        Q.   And he was -- was the conversation one-sided or

19   two-sided, would you say?

20        A.   I'd say it was pretty much two-sided.

21        Q.   In that Blackerby was asking questions, correct?

22        A.   Yes.

23        Q.   And Parker was answering those questions?

24        A.   Correct.

25        Q.   Now, was there a time during the interview when his
```

```
 1                    D. LANDY - DX BY MR. SLAWINSKI

 2     affect changed?

 3         A.   Yes, there was.

 4         Q.   And when did that happen?

 5         A.   Well, I'm not able to recall clearly when it happened.

 6     But at one point, he looked at Agent Blackerby, and I could see

 7     his -- I'll use the common term -- his jaw muscle twitching,

 8     which is usually a sign of intense emotion.  And he had in his

 9     eyes a kind of a flat appearance.  I couldn't tell because of

10     the lighting and the distance whether his pupils were large or

11     small, but there was this flat, glaring, staring kind of

12     expression as he looked at the agent.

13               MAGISTRATE JUDGE PAYSON:  And that was something

14     that was different about how he had been looking at the agent

15     prior to that time?

16               THE WITNESS:  Yes.

17               MAGISTRATE JUDGE PAYSON:  Okay.

18               THE WITNESS:  And the agent noticed it and asked

19     about it.

20         Q.   And then what happened?

21         A.   Then they continued their conversation.

22         Q.   Okay.  And was any mention made of Mr. Parker saying he

23     wanted to kill someone at that point?

24         A.   Yes.  He was saying that he wanted to take the agent's

25     gun and shoot him and other people.
```

1                     D. LANDY - DX BY MR. SLAWINSKI

2       Q.   And what reaction did that have for you?  What was your

3    reaction to that?

4       A.   Well, my reaction was -- I was concerned that Mr.

5    Parker was starting to have a lot of difficulty holding it

6    together for the interview, and I decided to wait and see how

7    the agent responded to it and what Mr. Parker would do before

8    allowing it to continue or deciding to terminate.

9       Q.   And then what happened?

10      A.   They talked about it, and he talked very

11   straightforwardly with the agent -- who handled it, I have to

12   say, quite well -- and then the interview proceeded.

13      Q.   You said that you were worried that Mr. Parker was

14   having difficulty holding it together?

15      A.   Yes.

16      Q.   Okay.  Did this happen before, during, or at the end of

17   the interview?

18      A.   Um --

19      Q.   At the beginning, middle, or end of the interview?

20      A.   I'd say close to the middle.

21      Q.   Okay.  And then the interview ended, correct?

22      A.   Yes.

23      Q.   And did you meet with Mr. Parker after that point,

24   between then and meeting with him later in that day to discuss

25   reworking his medication?

```
 1                    D. LANDY - DX BY MR. SLAWINSKI

 2        A.   Yes.

 3        Q.   Okay.  When did you meet with him?

 4        A.   Later that day.  I don't know when exactly that was.

 5        Q.   Okay.  And that was a second meeting that day, correct?

 6        A.   Right, because the first meeting was with the agent,

 7   and then the second meeting, just him and I, later.

 8        Q.   Okay.  And is that when you decided to -- decide to

 9   redo the medication?

10        A.   Well, no.  Actually, I decided that I needed to talk

11   with Mr. Parker about the medication during the interview.

12        Q.   Okay.

13        A.   And later on, I started the discussion, but we didn't

14   make any concrete plans.  We were going to revisit it the next

15   day.

16        Q.   And the next day being the --

17        A.   The 8th.

18        Q.   -- 8th.  Okay.  So you had two meetings with Parker,

19   correct?

20        A.   Yeah, essentially -- well, three.  I mean, one on the

21   6th and two on the 7th.

22        Q.   Two on the 7th, and then another one on the 8th, I

23   guess, right?

24        A.   Yeah.

25                    MAGISTRATE JUDGE PAYSON:  Can I ask you, Doctor, I
```

1                    D. LANDY - DX BY MR. SLAWINSKI
2      think you said you had treated Mr. Parker previously in the
3      hospital, previous to this admission?
4                    THE WITNESS:  Yes.
5                    MAGISTRATE JUDGE PAYSON:  Okay.  During the period
6      of time that you've been testifying about, up through the 7th,
7      did you review records from that prior hospitalization --
8                    THE WITNESS:  I did.
9                    MAGISTRATE JUDGE PAYSON:  -- regarding Mr. Parker?
10                   THE WITNESS:  Yes, I did.
11                   MAGISTRATE JUDGE PAYSON:  Did those records
12     illuminate any medication questions you were having?
13                   THE WITNESS:  Not really.  Those medication
14     questions led me to believe that Prolixin was a medication that
15     had worked well for him.
16                   MAGISTRATE JUDGE PAYSON:  Okay.
17                   THE WITNESS:  But during the interview, he said
18     that Prolixin never really worked well for him; he just said it
19     did so he could get out of the hospital.
20                   MAGISTRATE JUDGE PAYSON:  I see.  All right.
21       Q.   During the interview with Agent --
22       A.   With Agent -- yes.
23       Q.   -- with Agent Blackerby, he said the Prolixin did not
24     work well with him?
25       A.   Yes.

1                    D. LANDY - DX BY MR. SLAWINSKI

2       Q.   Okay.  And you used that to change his medication later

3   that day or the next day, correct?

4       A.   Correct.

5       Q.   Okay.  Now, on February 8th, you dropped the Prolixin

6   and you gave him another antipsychotic?

7       A.   Yeah.  I don't have that in here, though.

8       Q.   Okay.  Let's see.  I think it's on the next page.

9       A.   Nope.  I mean, here on the penultimate page, it says I

10  mentioned the various options, and I said, "This will be

11  discussed with the patient; we will choose a course together."

12      Q.   Okay.

13      A.   So, I didn't do anything that day about it.

14      Q.   Okay.  But you did the next day?

15      A.   Yeah.

16      Q.   You've also, in your reports, have said that while you

17  were diagnosing Mr. Parker, you did the diagnosis with

18  different axes, correct?

19      A.   Yes.

20      Q.   And those are taken from the DSM-IV, correct?

21      A.   Yes.

22      Q.   And that was, up until I guess last year, sort of like

23  the psychiatric bible?

24      A.   So to speak.  It doesn't talk much about creation, but

25  --

```
 1                  D. LANDY - DX BY MR. SLAWINSKI
 2       Q.   In your profession.
 3       A.   Yes.
 4       Q.   And you -- what is Axis V?  What does it symbolize, or
 5   what did it symbolize?
 6       A.   Axis V is a very inadequate means of trying to assess
 7   global assessment of functioning, which means, how well is the
 8   person doing overall?
 9       Q.   Okay.
10       A.   So, it's scored one to 100:  100 being perfectly
11   normal, which by definition nobody is; and 1 is the person is
12   absolutely completely impaired.
13                  MAGISTRATE JUDGE PAYSON:  This is GAF?
14                  THE WITNESS:  Yes.
15       Q.   And the GAF, or the global assessment of functioning,
16   you scored Mr. Parker, I believe, at 21, correct?
17       A.   Correct.
18       Q.   And that was both before and after the interview with
19   the Secret Service agent, right?
20       A.   Yes.
21       Q.   Okay.  And what does a GAF of 21 signify?
22       A.   That usually means that the person has significant
23   difficulties that are driven by hallucinations or delusions --
24   or their behavior is driven by hallucinations or delusions,
25   difficulty interacting with others, and difficulty taking care
```

1                     D. LANDY - DX BY MR. SLAWINSKI

2     of themselves.  And it doesn't have to be all three of those,

3     it could be any one of them or all three of them.

4          Q.   How did you make that determination in regard to Mr.

5     Parker?

6          A.   Based on the idea that his hallucinations were telling

7     him to do things that he -- he didn't want to do, but was

8     afraid he would do.  He felt that the best way to stop the

9     hallucinations was to go ahead and do what they said, and maybe

10    that would stop them.

11         Q.   Okay.

12         A.   So that's behavior driven by hallucinations or

13    hallucinatory behavior, and that would be in that range of 21

14    to 30.

15         Q.   Okay.  And that's why you classified Mr. Parker with

16    the GAF of 21, right?

17         A.   Yes.

18         Q.   Okay.  Ultimately, Mr. Parker stayed at Clifton Springs

19    for, I guess, several weeks, correct?

20         A.   Correct.

21         Q.   And do you remember the date that he was released?

22         A.   No, I do not.

23         Q.   Okay.  If I show you his discharge summary, would you

24    remember?  Giving you Defendant's Exhibit 3 for identification.

25         A.   February 28th, 2014.

```
 1                    D. LANDY - DX BY MR. SLAWINSKI
 2      Q.   Okay.  And what was his GAF at that point?
 3      A.   38.
 4      Q.   Okay.  And what does a GAF of 38 signify?
 5      A.   That the person still has some serious symptoms --
 6   perhaps depression, psychosis -- but it's not driving their
 7   behavior to the point of concern about dangerousness, and that
 8   they can function with reasonable support on an outpatient
 9   basis.
10      Q.   And within the weeks that he was at Clifton Springs,
11   his medication was adjusted several times to get to the point
12   that he was able to be discharged, correct?
13      A.   Correct.
14      Q.   Okay.  And at one point, Mr. Parker was hospitalized in
15   the emergency room?
16      A.   Well, he was sent to the emergency room and then
17   hospitalized on the acute medical floor, yes.
18      Q.   And what happened there?
19      A.   He apparently suffered pulmonary emboli.
20      Q.   And what's that?
21      A.   Those are blood clots that travel to the lung.
22               MAGISTRATE JUDGE PAYSON:  When did this happen?
23   I'm sorry.
24               THE WITNESS:  Let me see if I have that exactly.
25               MAGISTRATE JUDGE PAYSON:  This was sometime
```

```
 1                    D. LANDY - DX BY MR. SLAWINSKI
 2      between the 7th and the 28th of February?
 3                    THE WITNESS:  Yes.
 4                    MAGISTRATE JUDGE PAYSON:  Okay.
 5                    THE WITNESS:  I don't seem to have the exact date
 6      here.  I'm sorry.
 7                    MAGISTRATE JUDGE PAYSON:  Okay.  Thank you.
 8      Q.   Was it the 13th, if you remember?
 9      A.   I don't know.  I'd have to look.
10      Q.   Can I show you the radiology reports from --
11      A.   Sure.
12      Q.   Can you tell me when Mr. Parker was hospitalized in the
13      ER?
14      A.   Well, this was done on February 13th, so I'm assuming
15      that that's the day he went to the emergency room.
16      Q.   Do you remember how long he was out of the psychiatric
17      ward?
18      A.   I think about four or five days.
19      Q.   And then he transferred back in to the psychiatric
20      ward, correct?
21      A.   Yes, and that is what happened.
22      Q.   I'll return the document.  Thank you.
23           So it took, I guess, over three weeks to get Mr. Parker
24      to the point where he was able to be released, correct?
25      A.   Correct.
```

```
 1                    D. LANDY - DX BY MR. SLAWINSKI

 2        Q.   And at that point, was he still suffering from

 3   delusions?

 4        A.   Hallucinations.

 5        Q.   Hallucinations.  I'm sorry.

 6        A.   Yes, but they were much less, and they did not -- and

 7   as I mentioned, they were not driving his behavior.

 8        Q.   And so you released him, correct?

 9        A.   Yes.

10        Q.   And you arranged for follow-ups with his psychiatrist,

11   his outpatient psychiatrist, right?  Dr. Yue?

12        A.   Yes.

13        Q.   Okay -- as well as Lakeview, which is the social

14   service agency in --

15        A.   And where he was living, I believe.

16        Q.   Where was living.  Okay.

17             You also wrote a letter about his competence after the

18   discharge, correct?

19        A.   Yes.

20        Q.   Okay.  In there, you recommended that he be examined

21   again for whether or not he was competent or not, correct?

22        A.   Well, yes, from a forensic standpoint.

23        Q.   Okay.

24             MR. SLAWINSKI:  Okay.  I think that's all the

25   questions that I have.  Thank you, Doctor.
```

```
 1                    D. LANDY - DX BY MR. SLAWINSKI
 2                    THE WITNESS:  Thank you.  Do you want this from
 3      me?
 4                    MR. SLAWINSKI:  Actually, I would ask that
 5      Defendant's Exhibits A, B, and C, which are the doctor's
 6      reports, be admitted into evidence.
 7                    MAGISTRATE JUDGE PAYSON:  I'm not sure he's
 8      identified A, B, and C, but they're Dr. Landy's reports?
 9                    MR. SLAWINSKI:  Yes.
10                    MAGISTRATE JUDGE PAYSON:  Do you have any
11      objection?
12                    MR. GESTRING:  Judge, I have no objection to
13      those.
14                    MAGISTRATE JUDGE PAYSON:  All right.  Then I'll
15      receive exhibits A, B and C.
16                    (Defendant's Exhibits A, B and C were received
17      into evidence.)
18                    MAGISTRATE JUDGE PAYSON:  Mr. Slawinski, do you
19      have those reports?
20                    MR. SLAWINSKI:  I do.  They're right there.
21                    MAGISTRATE JUDGE PAYSON:  Okay.
22                    MR. GESTRING:  Judge, I think they were also filed
23      with the defendant's motion.
24                    MR. SLAWINSKI:  They were.
25                    MAGISTRATE JUDGE PAYSON:  Okay.  That's fine.
```

```
 1                    D. LANDY - CX BY MR. GESTRING

 2    Okay.  Thanks.

 3                    MR. GESTRING:  May I question?

 4                    MAGISTRATE JUDGE PAYSON:  You may.

 5                    MR. GESTRING:  Thank you.

 6    CROSS EXAMINATION BY MR. GESTRING:

 7        Q.  Good afternoon, sir.

 8        A.  Good afternoon.

 9        Q.  Dr. Landy, you were asked about some side effects of

10    the medications that Mr. Parker was on when he was admitted to

11    Clifton Springs Hospital.  Do you recall those questions?

12        A.  About Prolixin and Ativan.

13        Q.  Correct.  And you said that both can cause some

14    sluggishness, which is not common.  But, specifically, you said

15    that they did not impair Mr. Parker; is that correct?

16        A.  That is correct.

17        Q.  You were also asked some questions about the adjustment

18    to the medications.  Do you recall that?  Specifically the

19    dosage of the Prolixin.  Do you recall that?

20        A.  Yes, I do.

21        Q.  And I think you said, sir -- and I may have missed

22    something because I was rattling my papers -- but the reason

23    you decided to do that and when you had the meeting on the

24    7th -- you had the meeting with the Secret Service, correct?

25        A.  Yes.
```

```
 1                    D. LANDY - CX BY MR. GESTRING

 2      Q.   And then you met with Mr. Parker individually later

 3   that day, on the 7th, correct?

 4      A.   Correct.

 5      Q.   And you indicated that during the interview with Secret

 6   Service, Mr. Parker said that in the past, he has had problems

 7   with Prolixin; correct?  Or that it didn't work for him?

 8      A.   Not quite.  It didn't work as well for him as he led

 9   on.

10      Q.   And so that was the reason that you decided to alter

11   the dosage or the medications with respect to the Prolixin,

12   correct?

13      A.   Correct.

14      Q.   You also indicated, I think, that there was no thought

15   disorder present during the February 7th interview with Secret

16   Service, correct?

17      A.   Correct.

18      Q.   Now, prior to the interview with the Secret Service on

19   February 7th, 2014 at the Clifton Springs Hospital, Agent

20   Blackerby called you and said he was coming on the 7th,

21   correct?

22      A.   Correct.

23      Q.   And you had told Mr. Parker prior to the meeting that

24   he would be meeting with Secret Service agents, correct?

25      A.   Correct.
```

1                    D. LANDY - CX BY MR. GESTRING

2        Q.   And he acknowledged knowing about the meeting and the

3    purpose of the meeting -- "he" being Mr. Parker -- prior to

4    that meeting, correct?

5        A.   Yes.  I was very clear with him that this was

6    happening, and that all they wanted to do was talk with him,

7    and anything would proceed from there.

8        Q.   Now, you said you met with Mr. --  with Agent Blackerby

9    before you had the meeting with Mr. Parker on the 7th, correct?

10       A.   Well, I talked with him on the phone.

11       Q.   But when he came to -- when Agent Blackerby came to

12   Clifton Springs Hospital, you did talk to him for a few minutes

13   before the meeting, correct?

14       A.   Correct.

15       Q.   Now, was Nurse Dean present for that meeting as well?

16       A.   I do not recall.

17       Q.   Okay.  And isn't it true, sir, that Agent Blackerby

18   asked you if Mr. Parker was okay to talk to that day?

19       A.   I believe so.

20       Q.   And you said that, in fact, Mr. Parker was okay to

21   speak with?

22       A.   Yes.

23       Q.   And before that interview, sir, did you express any

24   concerns about Mr. Parker's ability to understand the nature of

25   the interview that you guys were having on the 7th?

```
 1                  D. LANDY - CX BY MR. GESTRING
 2      A.   No.
 3      Q.   Where did that interview take place, sir?
 4      A.   We have a conference room on the unit, and we met in
 5   that room.
 6      Q.   And that's just down the hall from your office, sir?
 7      A.   Yes, it is.
 8           MR. GESTRING:   Government's 1-A through E.  Judge,
 9   may I approach the witness?
10           MAGISTRATE JUDGE PAYSON:   Yes.
11      Q.   Sir, I'm going to be showing you some photographs
12   marked 1-A through 1-E.  I'd like you to look at those, please,
13   sir.
14      A.   Yes.  Do you want me to comment on them one at a time?
15      Q.   I just want you to look at them one at a time.
16           MR. GESTRING:   Judge, can I give a copy for the
17   Court?  I've already given Mr. Slawinski a copy.
18      Q.   Sir, do you recognize those photographs?
19      A.   I do.
20      Q.   What are depicted in those photographs, starting with
21   1-A?
22      A.   1-A is a photograph from the door of the conference
23   room, looking down the hall.
24      Q.   Is your office visible in that photograph, sir?
25      A.   It is.
```

```
 1                  D. LANDY - CX BY MR. GESTRING
 2    Q.   And where would that be, sir?
 3    A.   Can I point to it, or do you want me to identify it by
 4    words?
 5    Q.   Identify it by words, sir, if you would.
 6    A.   Okay.  It's the second door on the left.
 7              MAGISTRATE JUDGE PAYSON:  Counting the little
 8    sliver of a door?
 9              THE WITNESS:  That's the first one, yes.  How
10    about the door in front of the open door on the left?
11    Q.   Okay.  So the full closed door that's on the left,
12    directly across from the exits and that little fire
13    extinguisher sign?
14    A.   Yes.
15              MAGISTRATE JUDGE PAYSON:  That would be W-227?
16              THE WITNESS:  Yes.
17              MAGISTRATE JUDGE PAYSON:  Okay.
18              MR. GESTRING:  That's a good angle read.
19              THE WITNESS:  That's very good.  I couldn't make
20    that out.
21    Q.   1-B.  What's depicted in that photograph, sir?
22    A.   1-B is looking through the door of the conference room,
23    into the conference room itself.
24    Q.   And this is the conference room, again, where you had
25    the meeting with Agent Blackerby and Mr. Parker on February 7th
```

1                    D. LANDY - CX BY MR. GESTRING

2      of 2014?

3           A.   Yes.

4           Q.   1-C as in Charlie?

5           A.   1-C is a view from the door of the conference room,

6      looking towards the opposite side of the conference room.

7           Q.   So as you walk in, looking towards the back of the

8      room?

9           A.   Yes.

10          Q.   Photograph 1-D as in David?

11          A.   That's -- the door of the conference room is on the

12     left, the windows we saw in the previous photo are to the back

13     of the observer, and you're looking at the conference table.

14          Q.   So would it be fair to say that's the reverse or

15     converse of Photograph 1-C?  That's looking in, and that's

16     looking back out?

17          A.   Yes.

18          Q.   And then, finally, sir, 1-E as in Edward.  What is

19     that?

20          A.   1-E is almost the same as the previous one, except the

21     door to the conference room is closed.

22          Q.   Sir, do Government's 1-A through E -- do they fairly

23     and accurately represent the hallway outside the conference

24     room, the entrance door to the conference room, as well as the

25     inside of the conference room at Clifton Springs Hospital where

```
 1                    D. LANDY - CX BY MR. GESTRING

 2     the interview took place on February 7th, 2014 between

 3     yourself, Mr. Parker, Ms. Dean, and Special Agent Blackerby of

 4     the Secret Service?

 5         A.   They do.

 6              MR. GESTRING:   Judge, at this time I move 1-A

 7     through E into evidence.

 8              MR. SLAWINSKI:   No objection.

 9              MAGISTRATE JUDGE PAYSON:   Government's Exhibits

10     1-A through 1-E are received.

11              (Whereupon, Government's Exhibits 1-A through 1-E

12     were received into evidence.)

13         Q.   Now, I think you indicated on direct examination, sir,

14     that you were in the conference room when Mr. Parker came in,

15     correct?

16         A.   Correct.

17         Q.   Did he come in wearing any kind of restraints?

18     Handcuffs, a straitjacket, anything like that?

19         A.   No.

20         Q.   Was anybody physically leading him or directing him

21     into the conference room?

22         A.   No.

23         Q.   You said you were present for the entire duration of

24     the interview, correct?

25         A.   Yes.
```

1                    D. LANDY - CX BY MR. GESTRING

2       Q.   And was Nurse Dean present the entire time as well?

3       A.   Yes.

4       Q.   And, sir, I think you indicated on direct examination

5    that you were basically there to look out for Mr. Parker,

6    correct?

7       A.   Correct.

8       Q.   And that you were there to basically ensure that he

9    wasn't taken advantage of?

10      A.   Correct.

11      Q.   Were any other law enforcement agents present other

12   than Agent Blackerby?

13      A.   No.

14      Q.   Any type of hospital security, anybody posted at the

15   door, anything like that?

16      A.   No.

17      Q.   And sir, is it true that Agent Blackerby was dressed in

18   civilian clothing?

19      A.   In what?  I'm sorry.

20      Q.   Civilian clothing.  In other words, was he wearing a

21   uniform?

22      A.   No, no uniform.  Just --

23      Q.   At any point during this interview, did you see Agent

24   Blackerby display a firearm?

25      A.   No, I did not.

```
 1                    D. LANDY - CX BY MR. GESTRING
 2      Q.   Prior to the interview, sir --
 3                 MAGISTRATE JUDGE PAYSON:  Did you see a firearm on
 4      him?
 5                 THE WITNESS:  No, I did not.
 6      Q.   In fact, did you have any conversations about firearms
 7      with Agent Blackerby?
 8      A.   I may have.
 9      Q.   Related to the threat about taking his firearm?
10      A.   Well, yeah.  That happened halfway through the
11      interview.
12      Q.   Okay.  Prior to the interview, sir, is it true that
13      Agent Blackerby told Mr. Parker that this was a voluntary
14      interview, that he didn't have to be there?
15      A.   I believe so.
16      Q.   Now, did Mr. Parker acknowledge this?
17      A.   I don't recall.
18      Q.   Do you think Mr. Parker understood why he was there and
19      for what purpose he was there?
20                 MR. SLAWINSKI:  Objection.  Speculation.
21                 MAGISTRATE JUDGE PAYSON:  Overruled.
22      Q.   You can answer the question, sir.
23      A.   Yes, he understood.
24      Q.   Now, during the interview, sir, did Special Agent
25      Blackerby -- isn't it true that he never raised his voice?
```

1                   D. LANDY - CX BY MR. GESTRING

2        A.   That's true.

3        Q.   Is it true that he never yelled at Mr. Parker?

4        A.   That is true.

5        Q.   Is it true that he never threatened Mr. Parker in any

6    way?

7        A.   That is true.

8        Q.   Is it true that he never struck Mr. Parker or

9    threatened him with any kind of physical violence?

10       A.   Definitely not.  Definitely not.  That would have

11   brought security up.

12       Q.   So, in other words, you're saying it's clear that Agent

13   Blackerby did not threaten anybody?

14       A.   Yes.

15       Q.   Okay.

16       A.   Definitely not.  We would not have tolerated that for

17   one moment.

18       Q.   But, in fact, had anything happened to make you believe

19   that Mr. Parker was in jeopardy, you would have stopped that

20   interview, correct?

21       A.   Correct.

22       Q.   And you made that clear to Agent Blackerby right up

23   front; isn't that true?

24       A.   I did.

25       Q.   Effectively saying, "If I feel that there's a problem

1                    D. LANDY - CX BY MR. GESTRING

2     here, I'm going to stop this interview," correct?

3          A.   Correct.

4          Q.   And you were his treating psychiatrist, correct?

5          A.   I am.  I was.

6          Q.   And you were, but you had a prior patient relationship

7     with Mr. Parker as well?

8          A.   Right.  And my primary duty was to Mr. Parker, not to

9     Agent Blackerby.

10         Q.   And that's who you were there to protect or represent

11    during that interview, correct?

12         A.   Correct.

13         Q.   Now, did Agent Blackerby -- is it true that he never

14    told Mr. Parker that he was under arrest during that meeting?

15         A.   No, he never told him any such thing.

16         Q.   Is it true that Agent Blackerby did not ask Mr. Parker

17    leading questions?

18         A.   I'm not sure I know how to answer that.

19         Q.   Well, can you describe the type of questioning that

20    took place?  You were asked some questions by Mr. Slawinski

21    about the type of questions.  Can you describe those questions?

22         A.   Yeah.  They were actually, I thought, fairly

23    straightforward.  It was, like, "Can you tell me about this?

24    Can you tell me about that?"  You know, "You said this.  Can

25    you explain it?"  That kind of thing.

1                    D. LANDY - CX BY MR. GESTRING

2        Q.   What was Agent Blackerby's demeanor while he was asking

3    those questions?

4        A.   Serious but pleasant.

5        Q.   What was Mr. Parker's demeanor while he was answering

6    the questions?

7        A.   He was -- I think he was doing his best to answer the

8    questions.  He did not appear to be trying to weigh how to

9    answer the questions, but I think he was -- he was still

10   serious and trying to do the best he could.

11       Q.   So he was thoughtfully considering his answers prior to

12   making them?

13       A.   Not terribly so.  I think he was answering very

14   straightforwardly.  He wasn't weighing his answers, such as

15   should I answer this way, should I answer that way.  That's not

16   what I saw.

17       Q.   Now, you were asked some questions about the medical

18   complaints that Mr. Parker developed after his February 7th

19   interview with the Secret Service.  Do you recall that?

20       A.   Yes.

21       Q.   And on or about February 13th, he was admitted to the

22   medical service at Clifton Springs, correct?

23       A.   Correct.

24       Q.   And that was owing to some questions about his

25   responsiveness and concern that he might have been having a

1                    D. LANDY - CX BY MR. GESTRING

2      stroke, correct?

3          A.   Correct.

4          Q.   And, in fact, he was sent for what's called stroke

5      protocols in the emergency room; correct?

6          A.   Correct.

7          Q.   Can you describe what that means, sir?

8          A.   Yeah.  That means they do an emergency evaluation,

9      including a CAT scan, to see if there's any evidence of a

10     stroke going on.  And if there is, they can treat the stroke

11     with essentially clot-busting drugs to try and abolish or limit

12     the effects of the stroke.

13         Q.   So they're looking for circulatory impairment?

14         A.   Yes.

15         Q.   And in fact, he was diagnosed with a pulmonary embolism

16     and was treated for it in the medical unit, correct?

17         A.   Correct.

18         Q.   And then after his medical treatment, Mr. Parker was

19     re-admitted to the psychiatric service, where you once again

20     were his treating physician, correct?

21         A.   Correct.

22         Q.   Now, I think, sir, in some of your notes, you reflect

23     that during a session that you had with Mr. Parker following

24     his medical admission -- so the time period is:  Comes to your

25     service, he is then admitted to the medical service, he is then

1                    D. LANDY - CX BY MR. GESTRING

2      admitted back to your service.  I'm talking about that third

3      time period.  So when you spoke to him, you -- there were some

4      statements that you made about an interview, or rather that Mr.

5      Parker didn't recall some of the facts and circumstances

6      surrounding the interview with the Secret Service.  Do you

7      recall that?

8           A.   Yes, I do.

9           Q.   Can you describe that more artfully than I just did?

10          A.   I thought you did a very nice job.

11          Q.   Thank you.

12          A.   But he said that he had no recollection of having been

13     interviewed by the Secret Service.  He went on to say that he

14     had no recollection of coming to the hospital or anything after

15     he used some drugs prior to coming to the hospital; that he had

16     no recollection of going to the medical unit or anything that

17     was done there; that it was all gone.

18          Q.   Now, does that -- does any of that mean that he didn't

19     understand what was going on on February 7th?

20          A.   Not at all.

21          Q.   In fact, when you talked to him, he knew what was

22     happening on February 7th, correct?

23          A.   Yes.

24          Q.   And is there a medical explanation or a medical

25     intervening cause which could cause that type of forgetfulness

1                    D. LANDY - CX BY MR. GESTRING

2    about what happened previously during the admission?

3        A.   Yes.

4        Q.   Can you explain that, sir?

5        A.   Yes.  It's a little complicated, but --

6        Q.   We'll try to stay with you.

7        A.   -- bear with me.  There are several types of memory.

8    The one we're talking about is something called episodic

9    memory, which is memory for events.  When people have something

10   called retrograde amnesia, which means they forget what

11   happened before, it comes from a number of different things.

12   One could be trauma, which we can pretty much rule out because

13   he had a normal CT scan.  It could be from a --

14       Q.   A CT scan -- excuse me -- being a CAT scan, correct?

15       A.   Yes.  Sorry.

16       Q.   As part of his medical evaluation?

17       A.   That's when he had the stroke protocol.

18       Q.   Go on.

19       A.   Sometimes people have what's called a low-flow state,

20   which means there you get brain hypoxia, such as what may have

21   happened if somebody was showering their lungs with pulmonary

22   emboli, so you get decreased oxygen exchange, decreased oxygen

23   to the brain.  You get a low-flow state, and people can be sort

24   of -- if I can use a non-medical term -- wifty for a while.

25   That can sometimes be associated with retrograde amnesia.  It

1                    D. LANDY - CX BY MR. GESTRING

2     almost never happens with medications, and it can happen with

3     either physical or emotional trauma.

4          Q.   But again, that would have no basis -- or that would

5     have no bearing -- in other words, if -- based on your

6     explanation as it occurred just now, you said that the PE, the

7     pulmonary embolism, could be an intervening event, a medical

8     event which could cause that type of a problem, correct?

9          A.   Correct.  The fact that there's retrograde amnesia does

10    not -- does not affect, change, or have anything to do with

11    what went on in that period of time for which the person is

12    amnestic.

13         Q.   You were asked some questions about the GAF, and you

14    talked about the range of 21 at admission to 38 on discharge.

15    Do you recall that?

16         A.   I do.

17         Q.   Now, in between his admission on the 6th and his

18    discharge on the 28th, he had approximately three weeks of

19    antipsychotic medications or anti-hallucinogenic medications,

20    correct?

21         A.   Correct.

22         Q.   So you would expect that his GAF would, hopefully,

23    increase for the better, correct?

24         A.   Yes.

25                    MR. GESTRING:  Judge, those are my questions.

```
 1                    D. LANDY - CX BY MR. GESTRING
 2   Thank you.
 3                    MAGISTRATE JUDGE PAYSON:  Okay.  Before Mr.
 4   Slawinski gets up, Doctor, if I could ask you a few questions.
 5   Tell me how the meeting with Agent Blackerby was arranged.
 6                    THE WITNESS:  When I called on the 6th to report
 7   the problem, I spoke with Agent Blackerby who said he would
 8   call me back.  He called me back later that day, wanted to know
 9   if he could come out and meet with Mr. Parker the next day.
10   And I said, "Certainly.  Feel free to come out.  What time are
11   you going to be there so we can have a spot ready?"  And then
12   he came out on the 7th.
13                    MAGISTRATE JUDGE PAYSON:  Okay.  So you called
14   Secret Service on February 6th.  Did you call Agent Blackerby
15   in particular, or did you call a general number for Secret
16   Service?
17                    THE WITNESS:  No.  I called a general number, and
18   I said "Here is the situation.  Do you have somebody I should
19   talk to?"
20                    MAGISTRATE JUDGE PAYSON:  Okay.  What did you say
21   when you said "here is the situation"?
22                    THE WITNESS:  I said --
23                    MAGISTRATE JUDGE PAYSON:  In the first call.
24                    THE WITNESS:  I told them that I had a patient --
25   that I was a psychiatrist with a psychiatric patient, but the
```

```
 1                    D. LANDY - CX BY MR. GESTRING
 2     patient had made some comments about wanting to kill the
 3     President.  And I mentioned that I had seen this kind of thing
 4     before, and I was calling to see if they wanted to look into it
 5     or if they thought it was necessary, or whether it was not
 6     necessary.
 7                    MAGISTRATE JUDGE PAYSON:  Okay.  And that is
 8     information that you conveyed in a telephone call to Agent
 9     Blackerby on the 6th?
10                    THE WITNESS:  Well, he was the one I wound up
11     talking to.  How it came to be him, I don't know.
12                    MAGISTRATE JUDGE PAYSON:  And did I understand you
13     correctly that you talked to Blackerby once on the 6th, and
14     then he said at that time he'd call you back later?
15                    THE WITNESS:  Yeah.
16                    MAGISTRATE JUDGE PAYSON:  Okay.  So when you
17     talked to him the first time on the 6th, did you convey to him
18     what you just testified to?
19                    THE WITNESS:  Yes, I did.
20                    MAGISTRATE JUDGE PAYSON:  Okay.  And then what
21     happened when -- did he call you back?
22                    THE WITNESS:  He did.
23                    MAGISTRATE JUDGE PAYSON:  Okay.  And what happened
24     when he called you back?
25                    THE WITNESS:  He asked if he could come out the
```

```
 1                      D. LANDY - CX BY MR. GESTRING
 2      next day and interview Mr. Parker, and he gave me an
 3      approximate time.
 4                      MAGISTRATE JUDGE PAYSON:  Did he ask you any
 5      questions about your interview with Mr. Parker?
 6                      THE WITNESS:  I don't recall.
 7                      MAGISTRATE JUDGE PAYSON:  Okay.  Did you discuss
 8      in either of those telephone conversations any ground rules, if
 9      you will, for the interview that Blackerby wanted to have with
10      Mr. Parker?
11                      THE WITNESS:  No.  The only thing that I can
12      recall him saying is that he just wanted to come out and talk,
13      that there would be -- not coming out with any muscle or
14      anything like that, and you know, there was no intention of
15      arresting.  Initially, he just wanted to talk with Mr. Parker.
16                      MAGISTRATE JUDGE PAYSON:  Was there any discussion
17      between you and Agent Blackerby about the possibility of
18      criminal charges?
19                      THE WITNESS:  Not at that time.
20                      MAGISTRATE JUDGE PAYSON:  Okay.  Was there any
21      subsequent time?
22                      THE WITNESS:  I think that the closest it came is
23      that at the end of the interview or after the interview ended,
24      he said he was going to write it up and submit it to the
25      appropriate people, and they would make any decisions as to how
```

```
 1                    D. LANDY - CX BY MR. GESTRING
 2      to proceed.
 3                    MAGISTRATE JUDGE PAYSON:  Okay.  Did you ask any
 4      questions of him about what he meant by that?
 5                    THE WITNESS:  No.  I thought it was fairly
 6      self-explanatory.
 7                    MAGISTRATE JUDGE PAYSON:  Okay.  And what did you
 8      think it meant?
 9                    THE WITNESS:  I thought it meant that he would
10      write up the case and give it to the legal people, who would
11      take a look at it and see whether it was something that they
12      wanted to pursue criminal charges on or just simply put on a
13      watch list or drop completely.
14                    MAGISTRATE JUDGE PAYSON:  You told me that you had
15      at least two, or maybe three, prior incidents in which you
16      called Secret Service to report that one of your patients had
17      articulated something about killing the President; is that
18      right?
19                    THE WITNESS:  That's right.
20                    MAGISTRATE JUDGE PAYSON:  Okay.  In any of those
21      prior conversations with anybody from Secret Service, did you
22      have any general conversations about what Secret Service does
23      to evaluate that information, and whether they give
24      consideration to charging people?
25                    THE WITNESS:  I can't say I had a specific
```

1                    D. LANDY - CX BY MR. GESTRING

2    question, but I've put it together from the various episodes.

3                    MAGISTRATE JUDGE PAYSON:  Yeah, and I'm less

4    interested in what you've put together --

5                    THE WITNESS:  Right.

6                    MAGISTRATE JUDGE PAYSON:  -- as I am in what they

7    told you.

8                    THE WITNESS:  I don't recall anything specific,

9    with one exception.  One of them said that a lot of the

10   patients they interview who have a mental illness wind up on a

11   watch list, but nothing else.  Because many people who have a

12   mental illness will say things, but it doesn't always or

13   necessarily amount to anything that needs anything other than

14   just observation and monitoring.  So that's the closest I came

15   to anything more specific.

16                   MAGISTRATE JUDGE PAYSON:  Okay.  Thank you.  Mr.

17   Slawinski?

18   REDIRECT EXAMINATION BY MR. SLAWINSKI:

19   Q.   Building on that, Dr. Landy, did you say in your report

20   that Agent Blackerby, during your initial conversation with him

21   on the phone, said it was probably just nothing, that he was

22   just going to come down anyway to interview Mr. Parker?

23   A.   Well, he didn't say it was just nothing.  He said he

24   was going to come down to see Mr. Parker, but that nothing was

25   going to happen at that point.  He was just going to talk to

1            D. LANDY - RDX BY MR. SLAWINSKI

2     him.

3        Q.   Okay.  Did he say after you contacted, "He will simply

4     talk to him" -- being Mr. Parker -- "and that will be the end

5     of it"?  I could hand you your notes.

6        A.   Yeah, please.

7        Q.   I'm giving you Defendant's Exhibit A.

8        A.   Yes, that is what I wrote.

9        Q.   Okay.  And that was what you wrote based on your

10    conversation telephonically with Agent Blackerby, correct?

11       A.   Correct.

12       Q.   And you wrote that after you got off the phone with

13    him, correct?

14       A.   Right.

15       Q.   So do you remember him saying that on the phone now?

16       A.   Something along those lines.

17       Q.   So, that's accurate, what you wrote in your report,

18    correct?

19       A.   Yes.

20       Q.   Did you relay that information to Mr. Parker at all?

21       A.   I think -- I think I did, but I can't be sure.

22       Q.   Okay -- that he was just going to talk to him and that

23    would be the end of it?

24       A.   Yeah.

25       Q.   Okay.  So Mr. Parker knew that before -- you said that

1                    D. LANDY - RDX BY MR. SLAWINSKI

2     to Mr. Parker, rather, before the interview started, correct?

3         A.   Yes, I believe I did.

4         Q.   And you facilitated the interview with Agent Blackerby,

5     correct?

6         A.   Yes.

7         Q.   Okay.  You also stated that Mr. Parker was not

8     impaired, but he was suffering from hallucinations; is that

9     correct?

10        A.   That's correct.

11        Q.   How is that possible?

12        A.   Well, there's a difference between impairment and

13    having psychotic symptoms.  People who have psychotic symptoms

14    are not by nature necessarily impaired.  People are impaired

15    when their mental illness affects their ability to take care of

16    themselves or puts them at risk of hurting themselves or

17    others.  So there's a very careful demarcation, according to

18    New York State mental hygiene rules, as to where this line is

19    drawn, so that people who are blatantly psychotic aren't

20    hospitalizable under state law because they're not dangerous to

21    self or others.

22        Q.   But he was impaired in that he was having these

23    thoughts that he might harm himself or others, correct?

24        A.   Correct.

25        Q.   So he was impaired during the interview with Agent

```
 1                    D. LANDY - RDX BY MR. SLAWINSKI
 2   Blackerby?
 3       A.   Well, it depends.  You know, you're mixing up two
 4   things.  There's impairment and there's impairment.  There's
 5   impairment in terms of being able to take care of one's self,
 6   the risk to others and so on and so forth.  That by no means
 7   implies that people have cognitive impairment, which is
 8   something quite different.
 9       Q.   How is it different?
10       A.   Because one is a cognitive function -- how the person
11   thinks, understands, reasons, and so forth -- versus the
12   behavior that's driven by their hallucinations.
13       Q.   And at the time he was meeting with Agent Blackerby and
14   you, he was having hallucinations, correct?
15       A.   Yes.
16       Q.   He was also malodorous, correct?
17       A.   Not anymore, I don't think so.
18       Q.   Okay.  If I show you a report --
19       A.   Well, I know he was malodorous initially.  I don't know
20   how long that went on for before he cleaned up.  He might have
21   been, but I don't remember offhand.
22       Q.   Okay.  And that would have been an indication that he
23   hadn't been bathing, correct?
24       A.   Correct.
25       Q.   And that could be an indication of his thought
```

1              D. LANDY - RDX BY MR. SLAWINSKI

2    processes, not -- for lack of a better word -- being all there,

3    correct?

4         A.    Wrong.

5         Q.    He couldn't care for himself, correct?

6         A.    Well, there's caring for yourself and caring for

7    yourself.  There's meeting basic needs, which are defined as

8    food, clothing, and shelter.  Somebody who chooses not to wash,

9    on whatever basis, again, that's where you start drawing your

10   line between what's impairment and what's a civil liberty that

11   people have.  So this is not something that by itself means

12   anything.  In context, it's a contributing factor, but in and

13   of itself, you can't make much of that.

14        Q.    But you made a note of it --

15        A.    Yes, yes.

16        Q.    -- in your reports, correct?

17        A.    Right.

18        Q.    And it can be a symptom of being impaired, correct?

19        A.    Depends on what you mean by "impaired."  I mean, I'm

20   not trying to be difficult, but you have to be very careful

21   here so you don't, you know, mix your metaphors, so to speak.

22   Okay?  If you're saying the person is cognitively impaired,

23   where they don't understand what's happening, they don't

24   understand the reason for things, they can't give coherent

25   answers to questions, and so on and so forth, no, none of that

1                   D. LANDY - RDX BY MR. SLAWINSKI

2     has anything to do with that.  Impairment in terms of the

3     ability to care for one's self, which doesn't necessarily mean

4     impairment for cognitive function, yeah, that's possible.

5         Q.   Okay.  Now, I know there was discussion on the

6     Government's cross about what Mr. Blackerby was wearing,

7     correct?

8         A.   Yeah.

9         Q.   Were you also wearing civilian clothes?

10        A.   Pretty much like what I'm wearing now.  Probably not

11    the tie, but yes.

12        Q.   Okay.  So you were wearing something similar to what

13    Agent Blackerby was wearing, correct?

14        A.   Yeah.

15        Q.   Okay.  And you're in control and authority over the

16    ward at Clifton Springs, correct?

17        A.   Correct.

18        Q.   You are the -- I guess, the chief of the --

19        A.   Of the in-patient unit.

20        Q.   -- of the in-patient unit.  And you're the one that

21    makes the decision as to whether or not somebody ultimately

22    goes home or stays if they have a psychiatric hold on them,

23    correct?

24              MR. GESTRING:  Judge, again, I'm going to object.

25    Apparently he's leading.

1                    D. LANDY - RDX BY MR. SLAWINSKI

2                    MAGISTRATE JUDGE PAYSON:  Overruled.  Overruled.

3      Q.   Are you the one that makes that determination?

4      A.   I am.

5      Q.   Okay.  So you're the authority figure on that ward,

6  right?

7      A.   Yes, I am.

8      Q.   And, again, Mr. Parker was suffering from

9  hallucinations on -- from the point he came in, correct?

10     A.   Yes.

11     Q.   On the 5th.  And he was suffering from hallucinations

12  until after the meeting with Agent Blackerby, correct?

13     A.   Correct.

14     Q.   Okay.

15                   MR. SLAWINSKI:  Thank you.  No further questions.

16                   THE WITNESS:  Thank you.

17                   MAGISTRATE JUDGE PAYSON:  Mr. Gestring, any

18  follow-up?

19                   MR. GESTRING:  Briefly, Judge.

20  RECROSS EXAMINATION BY MR. GESTRING:

21     Q.   Dr. Landy, did you ever threaten Mr. Parker during the

22  course of the interview?

23     A.   No.

24     Q.   Did you ever force him to say or do anything during the

25  course of the interview?

1                  D. LANDY - RCX BY MR. GESTRING

2       A.   No.

3       Q.   You were asked some questions about the nature of your

4    report to Secret Service versus the nature of the information

5    that you learned in the course of the interview.  Would it be

6    fair to say, sir, that details you originally had from your

7    February 6th conversation with Mr. Parker, that they were very

8    different from what you actually learned during -- when you

9    were present for the interview on February 7th?

10      A.   That is accurate.

11      Q.   So, in other words, the information that you relayed to

12   Agent Blackerby was a very generic making threats, correct?

13      A.   Correct.

14      Q.   And you actually learned on the 7th that there was a

15   carefully articulated plan, including travel, looking things

16   up, obtaining a firearm, who to shoot first prior to getting to

17   and killing the President, correct?

18      A.   Correct.

19      Q.   You indicated you previously made reports to the Secret

20   Service.  Was that here, while you were at Clifton Springs?

21      A.   No.

22               MR. GESTRING:  Thank you, sir.  Those are my

23   questions.

24               MR. SLAWINSKI:  I just have one follow-up, your

25   Honor, if I may.

```
 1                    D. LANDY - RCX BY MR. GESTRING

 2             MAGISTRATE JUDGE PAYSON:  Mm-hmm.

 3             MR. SLAWINSKI:  The carefully articulated plans

 4    that Mr. Parker was said to have made, those were a response to

 5    his command hallucinations, correct?

 6             THE WITNESS:  No.  I don't think so.  The response

 7    to the command hallucination is the idea to do something.

 8             MR. SLAWINSKI:  Okay.

 9             THE WITNESS:  How the person goes about planning

10    it is something completely different.

11             MR. SLAWINSKI:  Thank you.

12             THE WITNESS:  By the way, do you want these

13    pictures back?

14             MAGISTRATE JUDGE PAYSON:  Hold on one second, Dr.

15    Landy.

16             THE WITNESS:  Sorry.

17             MAGISTRATE JUDGE PAYSON:  Did Mr. Parker ever ask

18    if he could leave the conversation, leave the conference room?

19             THE WITNESS:  No.

20             MAGISTRATE JUDGE PAYSON:  During that meeting with

21    Agent Blackerby is what I'm talking about.

22             THE WITNESS:  I understand.

23             MAGISTRATE JUDGE PAYSON:  Okay.  Did he ever

24    express, during the interview, any discomfort with the

25    interview?
```

```
1                   D. LANDY - RCX BY MR. GESTRING
2                   THE WITNESS:  No.
3                   MAGISTRATE JUDGE PAYSON:  Okay.  Did he ever ask
4       any questions of you, Mr. Parker, during the interview?
5                   THE WITNESS:  No, he did not.
6                   MAGISTRATE JUDGE PAYSON:  Okay.  Anybody have
7       anything else?
8                   MR. GESTRING:  Just one follow-up on that.
9                   Dr. Landy, had Mr. Parker asked to leave the
10      interview or terminate the interview, would you have done so?
11                  THE WITNESS:  Yes.
12                  MR. GESTRING:  Thank you.
13                  MAGISTRATE JUDGE PAYSON:  Anything else?
14                  MR. SLAWINSKI:  You were his advocate during the
15      interview?
16                  THE WITNESS:  I feel very strongly that I'm an
17      advocate for every one of my patients.
18                  MR. SLAWINSKI:  Okay, thank you.  No further
19      questions.
20                  MAGISTRATE JUDGE PAYSON:  Okay.  Dr. Landy, thank
21      you very much.
22                  THE WITNESS:  Thank you.
23                  MAGISTRATE JUDGE PAYSON:  I appreciate you coming
24      in.
25                  THE WITNESS:  These were -- okay, thanks.
```

1                    K. DEAN - DX BY MR. SLAWINSKI

2                    MAGISTRATE JUDGE PAYSON:  Mr. Gestring, I'll give

3        you back these.

4                    MR. GESTRING:  Thank you, Judge.

5                    MAGISTRATE JUDGE PAYSON:  Could you give him

6        these?  Okay.  Mr. Slawinski, do you have another witness?

7                    MR. SLAWINSKI:  Yes.  We would call Nurse Kim

8        Dean.

9                    MAGISTRATE JUDGE PAYSON:  Thank you.  You okay to

10       keep going?  Kim, did you say?  Kim Dean.

11                   Ms. Dean, right up here, please.

12       (K. Dean was called to the witness stand and sworn.)

13                   THE CLERK:  Thank you.  Please be seated.  When

14       you are seated, please state your full name and spell your last

15       name for the record.

16                   THE WITNESS:  My name is Kimberly Dean, D-e-a-n.

17                   MAGISTRATE JUDGE PAYSON:  All right.  Good

18       afternoon.

19       DIRECT EXAMINATION BY MR. SLAWINSKI:

20          Q.   Good afternoon, Ms. Dean.  I just have a few questions

21       for you.  Where do you work?

22          A.   Clifton Springs Hospital and Clinic, In-patient Psych.

23          Q.   And what do you do there?

24          A.   I'm the unit coordinator for the in-patient psychiatric

25       unit.

```
 1                    K. DEAN - DX BY MR. SLAWINSKI
 2        Q.   How long have you been doing that?
 3        A.   On that particular unit, since 2011.  April of 2011.
 4        Q.   Do you know Dr. Douglas Landy?
 5        A.   Yes, I do.
 6        Q.   What is your relationship like with him?
 7        A.   What is my relationship like?
 8        Q.   With him, yes.
 9        A.   We've got a good relationship, working relationship,
10   professional.
11        Q.   Okay.  And you work with him as a nurse, correct?
12        A.   Yes.
13        Q.   Do you know Ronnie Parker?
14        A.   He's been a patient with us a few times.
15        Q.   Do you see him in this courtroom?
16        A.   Yes.
17        Q.   Can you point him out?
18        A.   The gentleman in the tan.
19        Q.   At the defense table?
20        A.   Mm-hmm.
21             MAGISTRATE JUDGE PAYSON:  The record will reflect
22   the witness has identified Mr. Parker.
23        Q.   Do you remember encountering Mr. Parker in February of
24   2014?
25        A.   Yes.
```

1                    K. DEAN - DX BY MR. SLAWINSKI

2        Q.   Okay.  Do you remember the date?

3        A.   It was around Valentine's Day, so the beginning of

4    February; 13th, maybe.

5        Q.   Okay.  Did you encounter him at his initial intake?

6        A.   I don't recall.  I don't believe so.  I didn't do the

7    intake.

8        Q.   Okay.  Were you attending a meeting -- were you in

9    attendance with a meeting that he had with a Secret Service

10   agent?

11       A.   Yes.

12       Q.   And who else was at that meeting?

13       A.   It was a Secret Service agent, Dr. Landy, myself, and

14   Mr. Parker.

15       Q.   Okay.  And do you remember the exact date of that?

16       A.   No, I don't.

17       Q.   Okay.  And how long did that meeting last?

18       A.   Approximately an hour, maybe a little over.

19       Q.   And who was -- do you remember who the Secret Service

20   agent was, what his name was?

21       A.   I'm terrible with names, but I believe his first name

22   was Joel Black something.

23       Q.   Blackerby?

24       A.   Yeah.

25       Q.   And how was the questioning conducted during that

1                    K. DEAN - DX BY MR. SLAWINSKI

2    interview?

3        A.   Conversational tone, just -- you know, we were sitting

4    around a conference table and, you know, just asking questions

5    and, you know, easy conversation, basically.

6        Q.   Was Mr. Parker answering questions that were posed by

7    Agent Blackerby?

8        A.   Oh, yes.

9        Q.   Okay.  Was Mr. Parker agitated at all during the

10   interview?

11       A.   In the beginning, no, but he did get agitated at one

12   point.

13       Q.   At what point did he get agitated?

14       A.   He seemed as if he was responding to something.  He

15   looked off to the side, got very tense, and then the agent

16   asked him what was going on.  He was concerned because there

17   was a noticeable change.

18       Q.   And then what happened?

19       A.   Then Mr. Parker said, "They're telling me to grab your

20   gun and shoot everybody," something along those lines.

21       Q.   And did he appear like that when he was talking about

22   the remarks he made about the President?

23       A.   Did he appear agitated?

24       Q.   Yeah.

25       A.   No, not agitated at all.

1               K. DEAN - DX BY MR. SLAWINSKI

2     Q.   What was his demeanor when Agent Blackerby -- well, was

3   Agent Blackerby questioning him about some threats to the

4   President?

5     A.   He did question him about those.

6     Q.   Okay.  And Mr. Parker answered Agent Blackerby's

7   questions, correct?

8     A.   Yes.

9     Q.   Okay.  What was Mr. Parker's demeanor like while he was

10  answering those questions?

11    A.   He's always very soft-spoken and calm.

12    Q.   Okay.

13    A.   That's how he was.

14    Q.   And he wasn't yelling at the agent?

15    A.   No, sir.

16    Q.   His voice wasn't raising?

17    A.   (Inaudible.)

18    Q.   Okay.  And to your -- the interview was -- up until the

19  point that Mr. Parker made the remark about the gun, it had

20  gone calmly, correct?

21    A.   Yes.

22    Q.   And what was Agent Blackerby's interview style like?

23    A.   Laid back and conversational.  Not pushing, not delving

24  at all.  Matter-of-fact.

25    Q.   Okay.  And was he talking to him like he was a medical

1                K. DEAN - DX BY MR. SLAWINSKI

2     professional?

3        A.   He was talking to him as if he was just gathering data

4     to do an assessment.  It just seemed like a data gathering.

5        Q.   Now, did you have any reaction to -- after you heard

6     Agent Blackerby question Mr. Parker, did you have any reaction

7     to what he said about what he was going to do to the President?

8        A.   Did I have any reaction?

9        Q.   What did you think about it?

10       A.   I don't recall.

11       Q.   Were you surprised at all?

12       A.   In my line of work, I hear a lot of stuff.  Yes.

13       Q.   And do you remember how Mr. Parker was brought into the

14    conference room?

15       A.   I believe I went to his room and got him.  He was

16    laying down.

17       Q.   Okay.

18       A.   And he knew that the Secret Service was coming that

19    day.  And I had spoken to him that morning, also.  And I just

20    went down and said, "They're here to see you," and I walked to

21    the conference room with him.

22       Q.   Okay.  And, again, this is a locked ward, correct?

23       A.   Yes.

24       Q.   Okay.  And he wasn't allowed to leave the ward, right?

25       A.   No.

1               K. DEAN - DX BY MR. SLAWINSKI

2       Q.   And did you escort him away from the meeting as well?

3       A.   I don't recall.

4       Q.   Are patients allowed to walk freely in the psychiatric

5    ward, or are they escorted between room and room?

6       A.   We're an open-air psych facility.

7       Q.   So they can walk between the conference room and their

8    -- I guess their bedroom?

9       A.   Yep.

10      Q.   Had he been sleeping when you went to get him?

11      A.   Yeah, he was laying down.  I believe it was just a

12   little after breakfast.  He -- yeah.

13      Q.   And had -- based on your observation of Mr. Parker, was

14   he under the influence of any medications that you could tell,

15   during the interview?

16      A.   I would have to say yes.  I believe we restarted his

17   medications, and a lot of the antipsychotics are sedating.

18      Q.   Okay.

19      A.   So after he took his morning meds, we don't usually

20   have a problem with them going back to bed if we're restarting

21   them.

22      Q.   Okay.  So he took his morning meds before the

23   interview?

24      A.   I do believe.

25      Q.   Okay.  And they're sedating?

1                    K. DEAN - DX BY MR. SLAWINSKI

2        A.   They can be.

3        Q.   Okay.  Was he sleeping before he came to the interview,

4    in his room?

5        A.   I can't tell you if he was sleeping.  I had to call his

6    name to have him roll over and acknowledge, then he just got up

7    right away and came down with me.

8        Q.   Did he appear tired during the interview?

9        A.   No.  He's usually just mellow.  He was --

10       Q.   Was he mellow at the time?

11       A.   Yeah.

12       Q.   Okay.  He wasn't agitated, I guess is my --

13       A.   No.

14       Q.   Do you know what he did after he left the interview?

15       A.   I believe he went back to his room.

16       Q.   Do you know if he went to sleep?

17       A.   I don't know.

18       Q.   And did he have a single room or a double room?

19       A.   He had a single room.

20       Q.   And during the interview while he was being questioned

21    by Agent Blackerby, was he forthcoming?

22       A.   I wouldn't say forthcoming.  He answered every question

23    but didn't give many details.

24            MR. SLAWINSKI:  Okay.  Thank you.  That's all the

25    questions I have.

1                    K. DEAN - DX BY MR. SLAWINSKI

2                    MAGISTRATE JUDGE PAYSON:  Ms. Dean, you mentioned

3       that earlier in the morning, you had spoken to Mr. Parker.

4                    THE WITNESS:  Yes.

5                    MAGISTRATE JUDGE PAYSON:  Had you spoken to him

6       about the interview with Agent Blackerby?

7                    THE WITNESS:  I speak to everyone each morning.  I

8       don't recall exactly what was said, but we had talked to him

9       the day before and let him know this was going on.  Yes, I did

10      speak to him, because I asked him if he still wanted me to go

11      in there, if he would be more comfortable having someone in

12      there with him.

13                   MAGISTRATE JUDGE PAYSON:  And what did he say?

14                   THE WITNESS:  Yes, he would.

15                   MAGISTRATE JUDGE PAYSON:  He would prefer you go

16      with him?

17                   THE WITNESS:  Yes.

18                   MAGISTRATE JUDGE PAYSON:  And you had a

19      conversation with him the preceding day about the meeting --

20                   THE WITNESS:  I believe Dr. Landy did that; Dr.

21      Landy informed him.  I was aware that the conversation was

22      happening --

23                   MAGISTRATE JUDGE PAYSON:  But were you present for

24      it?

25                   THE WITNESS:  No, I wasn't.

1                K. DEAN - DX BY MR. SLAWINSKI

2                MAGISTRATE JUDGE PAYSON:  Okay.  When the

3       conversation began between Agent Blackerby and Mr. Parker in

4       the conference room, did Agent Blackerby say anything to Mr.

5       Parker about the purpose of the conversation?

6                THE WITNESS:  He said that he was notified by Dr.

7       Landy, that these statements had been made, and he explained

8       that we have to report them, and that he was there gathering

9       information.

10               MAGISTRATE JUDGE PAYSON:  Okay.  So, Agent

11      Blackerby said, "We have to report them"?

12               THE WITNESS:  No.  I believe he explained to Mr.

13      Parker that as part of our jobs in healthcare --

14               MAGISTRATE JUDGE PAYSON:  I see.  That you all

15      have to report them.

16               THE WITNESS:  We had to.

17               MAGISTRATE JUDGE PAYSON:  Did Agent Blackerby say

18      anything to Mr. Parker about what, if anything, he was

19      intending to do with the information he was gathering?

20               THE WITNESS:  I don't recall that.  I don't

21      believe so.

22               MAGISTRATE JUDGE PAYSON:  Was there any discussion

23      of arrest?

24               THE WITNESS:  No.

25               MAGISTRATE JUDGE PAYSON:  Any discussion of

1                    K. DEAN - DX BY MR. SLAWINSKI

2     criminal charges?

3                    THE WITNESS:  No.

4                    MAGISTRATE JUDGE PAYSON:  Okay.  Did Mr. Parker

5     ask any questions about whether anything would happen to him?

6                    THE WITNESS:  No.

7                    MAGISTRATE JUDGE PAYSON:  Okay.  Did Mr. Parker

8     ever ask if he could leave?

9                    THE WITNESS:  No.

10                    MAGISTRATE JUDGE PAYSON:  Did he ever express any

11    discomfort with the interview?

12                    THE WITNESS:  No.

13                    MAGISTRATE JUDGE PAYSON:  Okay.  Did he ever fall

14    asleep --

15                    THE WITNESS:  No.

16                    MAGISTRATE JUDGE PAYSON:  -- in the interview?

17                    THE WITNESS:  No, not that -- no.

18                    MAGISTRATE JUDGE PAYSON:  All right.

19                    Mr. Gestring?

20                    MR. GESTRING:  Thank you, Judge.

21                    MAGISTRATE JUDGE PAYSON:  Thank you.

22                    THE WITNESS:  You're welcome.

23    CROSS EXAMINATION BY MR. GESTRING:

24        Q.  Ms. Dean, good afternoon.

25        A.   Hi.

1                    K. DEAN - CX BY MR. GESTRING

2      Q.   You said you escorted Mr. Parker from his room to the

3  conference room; is that correct?

4      A.   Yes.

5      Q.   Did you ever put your hands on Mr. Parker?

6      A.   No, I did not.

7      Q.   Did you ever restrain him or put a straitjacket or any

8  type of cuffs or restraints on him?

9      A.   No.

10     Q.   Now, you indicated that the floor is open, correct?

11     A.   Correct.

12     Q.   So people can just wander around from room to room as

13  they see fit?

14     A.   Every office area, any area that poses a risk for any

15  sharps or anything like that is locked.  But any areas that are

16  considered secure are open.  Like, we have a lounge area that

17  doesn't have anything that you can hang yourself or harm

18  yourself on, and also a television area.  And those, they can

19  come in and out, as long as staff is right there.

20     Q.   But when a patient moves from room to room, they don't

21  need to be escorted, correct?

22     A.   No.  I can't say as I escorted him -- like we do a

23  one-person escort that we learn in our training.  I was just

24  walking next to him, talking to him.  Just walked next to him

25  in the hall and --

```
1                      K. DEAN - CX BY MR. GESTRING
2        Q.   So is it fair to say it was more of a notification,
3    "Hey, it's meeting time.  Let's go"?
4        A.   Exactly.
5        Q.   And then he got up and he went with you, correct?
6        A.   Yes.
7        Q.   If he would have said, "I don't want to go," what would
8    you have done?  Would you have forced him?
9        A.   Absolutely not.
10       Q.   Now, when you went back to the conference room, you
11   were there basically -- you said that you had spoken to Mr.
12   Parker, and Mr. Parker requested that you were present,
13   correct?
14       A.   I asked him if he would be more comfortable having one
15   of us there, because we didn't know what was going to happen.
16   We'd never had this happen where Secret Service comes in.  And
17   so we were kind of protective of Mr. Parker, and we said, you
18   know, "We don't know exactly how this is going to go, but we're
19   happy to sit in there with you."
20       Q.   Because you watch a lot of TV and hear about water
21   boarding and things like that, right?
22       A.   Oh, yeah.  Yes.
23       Q.   Did the experience that your viewing of the interview,
24   was it consistent with what you've seen on TV and what you've
25   heard about?
```

```
 1                 K. DEAN - CX BY MR. GESTRING
 2        A.   Absolutely not.
 3        Q.   You were asked and you started to describe Agent
 4   Blackerby's interview style.  Can you expand on that a little
 5   bit?  I think you stopped.
 6        A.   He had a kind of a laid back -- like you wanted to
 7   answer his questions.  It's hard to explain what his interview
 8   style was, but it wasn't threatening, it wasn't aggressive.  I
 9   mean, I have seen those, because we've had aggressive,
10   threatening patients.  I've seen psychiatrists have interviews
11   like that, I've seen -- and it was nothing like that.  It
12   simply seemed like a fact-finding interview.  "Can you tell me
13   about this," and, you know.
14        Q.   Did Agent Blackerby ever threaten Mr. Parker?
15        A.   Oh, absolutely not.
16        Q.   Did he ever say something like, "If you don't tell me
17   this, I'm going to lock you up"?
18        A.   No.
19        Q.   Did he ever produce handcuffs or a firearm?
20        A.   No.
21        Q.   You were present for the whole interview, correct?
22        A.   The entire interview.
23        Q.   And did he ever make any kind of promises:  "If you
24   tell me this, nothing will happen to you"?
25        A.   No.  Mr. Parker was forthcoming.  Mr. Parker is always
```

```
 1                   K. DEAN - RDX BY MR. SLAWINSKI
 2    very polite, soft-spoken.  It was just a pleasant exchange.
 3    Not pleasant -- they weren't laughing -- but he was very honest
 4    and answered all questions openly and calmly.
 5         Q.   Now, Nurse Dean, had you had any kind of mental health
 6    concerns or had you -- during the interview, if you would have
 7    had any concerns, would you have stopped the interview?
 8         A.   Oh, yes.
 9                   MR. GESTRING:  Judge, those are my questions.
10    Thank you.
11                   MAGISTRATE JUDGE PAYSON:  Okay.  Thank you.
12    REDIRECT EXAMINATION BY MR. SLAWINSKI:
13         Q.   Just in regard to Agent Blackerby's interview style, do
14    you remember telling me yesterday or last week that he
15    interviewed like a psychiatrist?
16         A.   A type of psychiatrist.
17         Q.   Okay.
18         A.   Yeah.
19         Q.   So the questions he was asking and how he was asking
20    the questions?
21         A.   He talked -- he phrased his questions as if he was
22    asking out of concern.
23         Q.   Okay.
24         A.   I guess that's the best way I can say that.
25         Q.   And what were you dressed in during the interview?
```

1                    K. DEAN - RDX BY MR. SLAWINSKI

2       A.   Probably exactly what I have on, maybe a different

3   color scrub top, so --

4       Q.   Scrubs.  Okay.

5       A.   Business medical.

6            MR. SLAWINSKI:  Okay.  That's all the questions I

7   have.  Thanks.

8            MAGISTRATE JUDGE PAYSON:  Mr. Slawinski, do you

9   have a copy of your motion papers?

10           MR. SLAWINSKI:  I do.

11           MAGISTRATE JUDGE PAYSON:  Could I just take a look

12   at that before we excuse Ms. Dean?

13           MR. GESTRING:  Judge, I just have one follow-up

14   question.

15           MAGISTRATE JUDGE PAYSON:  Okay.  Go ahead.

16   RECROSS EXAMINATION BY MR. GESTRING:

17      Q.   Nurse Dean, you were just asked, and I think you said

18   that he asked -- that Agent Blackerby asked questions like a

19   psychologist, correct?  Or a psychiatrist?

20      A.   Psychiatrist, yeah.

21      Q.   Psychiatrist.  But he did identify himself to Mr.

22   Parker as a Secret Service agent, correct?

23      A.   Absolutely.

24      Q.   And he did say that he was there interviewing Mr.

25   Parker about a threat he made to kill the President, correct?

1                          USA VS. W. HARRIS

2        A.   Yes.

3        Q.   So he never claimed to be a psychiatrist or anything

4    like that, did he?

5        A.   No.  I'm having trouble describing what the interaction

6    between the agent and Mr. Parker were.  It was just a very

7    easygoing -- like, I've seen psychiatrists before, out of

8    concern, just answer my questions:  "No harm will come to you."

9    That kind of thing.

10       Q.   But he always said he was a law enforcement agent,

11   there to conduct an investigation, correct?

12       A.   Absolutely.  Mm-hmm.

13                 MR. GESTRING:  Thank you, ma'am.

14                 MAGISTRATE JUDGE PAYSON:  Did Mr. Parker seem

15   intoxicated in any way?

16                 THE WITNESS:  Not intoxicated, no.

17                 MAGISTRATE JUDGE PAYSON:  Okay.  You told me that

18   the medications can have a sedative effect.

19                 THE WITNESS:  Exactly.

20                 MAGISTRATE JUDGE PAYSON:  Did he show symptoms of

21   being sedated during the interview?

22                 THE WITNESS:  Not during the interview, no.

23                 MAGISTRATE JUDGE PAYSON:  Okay.  Was he ever asked

24   a question, to your recollection, that he didn't understand,

25   that he said he didn't understand?

1                    USA VS. W. HARRIS

2                    THE WITNESS:  Not that I can recall.  He answered

3      very easily most of the questions.

4                    MAGISTRATE JUDGE PAYSON:  And were his answers

5      generally responsive to the question that was asked?

6                    THE WITNESS:  Yes.

7                    MAGISTRATE JUDGE PAYSON:  Did he evidence any

8      confusion?

9                    THE WITNESS:  No.

10                   MAGISTRATE JUDGE PAYSON:  Okay.  Either about the

11     questions or the purpose of the interaction?

12                   THE WITNESS:  No.

13                   MAGISTRATE JUDGE PAYSON:  Okay.  And just give me

14     one minute.

15                   Do you remember whether Agent Blackerby advised

16     Mr. Parker of Miranda warnings?  Do you know what Miranda

17     warnings are?

18                   THE WITNESS:  Yes, I --

19                   MAGISTRATE JUDGE PAYSON:  Do you have any

20     recollection one way or the other?

21                   THE WITNESS:  I don't have any recollection of

22     that.

23                   MAGISTRATE JUDGE PAYSON:  Was there any discussion

24     that you were involved in with Mr. Parker about doctor-patient

25     confidentiality or privilege?

```
1                        USA VS. W. HARRIS

2                 THE WITNESS:  Ask me again?  I'm sorry.

3                 MAGISTRATE JUDGE PAYSON:  Okay.  Did you have any

4    conversation with Mr. Parker about doctor-patient privilege or

5    confidentiality as it related to the interview with Agent

6    Blackerby?

7                 THE WITNESS:  I did not, not specifically.  I

8    helped with the consent.  Mr. Blackerby brought in a consent

9    for the Secret Service to access his records, and I was there

10   when he explained that to Mr. Parker and had him sign the

11   consent of release of information for the --

12                MAGISTRATE JUDGE PAYSON:  Okay.  Do you remember

13   what he said to Mr. Parker about that?

14                THE WITNESS:  He asked him if it was okay if they

15   accessed his medical records.

16                MAGISTRATE JUDGE PAYSON:  And what did Mr. Parker

17   say?

18                THE WITNESS:  He said, yes," and he signed it.

19                MAGISTRATE JUDGE PAYSON:  Okay.

20                Mr. Slawinski, anything else?

21                MR. SLAWINSKI:  I don't think so, Judge.  Thank

22   you.

23                MAGISTRATE JUDGE PAYSON:  All right.  Mr.

24   Gestring, you're done, yes?

25                MR. GESTRING:  No, Judge, thank you.
```

```
1                        USA VS. W. HARRIS

2                  MAGISTRATE JUDGE PAYSON:  Okay.  Ms. Dean, thank

3      you very much.  Appreciate your coming in.

4                  THE WITNESS:  Thank you.

5                  MAGISTRATE JUDGE PAYSON:  Okay.  Mr. Slawinski, do

6      you have any other witnesses whom you seek to offer?

7                  MR. SLAWINSKI:  No, Judge.

8                  MAGISTRATE JUDGE PAYSON:  Okay.  So we're just

9      left with Agent Blackerby then.

10                 MR. GESTRING:  Yes, your Honor.

11                 MAGISTRATE JUDGE PAYSON:  And I think there was

12     some discussion about Friday?

13                 MR. GESTRING:  Yes, Judge.  We thought sooner

14     rather than later.

15                 MAGISTRATE JUDGE PAYSON:  Yeah, I agree.  I'm open

16     on Friday.

17                 MR. GESTRING:  If we could try, Judge, I have not

18     yet contacted Agent Blackerby, but I think he indicated that

19     the mornings were okay for him.  So I would tentatively say if

20     we could do 10 o'clock on Friday morning?

21                 MAGISTRATE JUDGE PAYSON:  Sure.  Does that work

22     with you, Mr. Slawinski?

23                 MR. SLAWINSKI:  I think so, Judge.  I don't have

24     my calendar, but I don't think I have anything on Friday.

25                 MAGISTRATE JUDGE PAYSON:  Okay.  Well, I'm going
```

1

2     to put it on for 10 o'clock on Friday.  And, Mr. Gestring, if

3     Agent Blackerby is, for some reason, not available, you'll let

4     us know.  And, Mr. Slawinski, when you go back and look at your

5     calendar, if you've got a problem with that time, let me know.

6     We can certainly adjust it.

7                     MR. GESTRING:  Okay, Judge.

8                     MR. SLAWINSKI:  Thank you.

9                     MAGISTRATE JUDGE PAYSON:  Thank you.  Have a nice

10    afternoon.

11                    MR. SLAWINSKI:  Thank you.

12

13                    CERTIFICATE OF TRANSCRIBER

14

15       I certify that the foregoing is a correct transcript from

16    the official electronic sound recording of the proceedings in

17    the above-entitled matter.

18

19    /s Karen J. Bush, RPR

20    Official Court Reporter

21

22

23

24

25