IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------

UNITED STATES OF AMERICA,

    -vs-                                                                                              14-CR-6045 EAW

RONNIE PARKER,

        Defendant.
-------------------------------------------------------------------------

## GOVERNMENT'S TRIAL MEMORANDUM

The United States of America, by and through its attorneys, William J. Hochul, Jr., United States Attorney for the Western District of New York, Craig R. Gestring, Assistant United States Attorney, of counsel, hereby files its trial memorandum and requests leave to supplement this memorandum as further issues are identified.

**I.    STATUS OF THE CASE**

    A.    A jury trial is scheduled to commence at 9:00 a.m. on September 8, 2105.

    B.    Estimated time for trial is less than one week. The Government expects to call between two to three witnesses.

    C.    The defendant is in custody.

    D.    The defendant is charged by way of Indictment with one count which charges the defendant with making a threat against the President of the United States, in violation of Title 18, United States Code, Section 871.

II. <u>**SUMMARY OF THE EVIDENCE**</u>

On February 6, 2014, United States Secret Service Special Agent Joel Blackerby was contacted by Douglas Landy, MD, who reported that his patient Ronnie Parker had sought treatment at the Clifton Springs Hospital because he was hearing voices directing him to kill the President, which were scaring him. In response to Blackerby's questions, Landy disclosed that Parker previously had been treated at the Hospital and that his prior medication regimen would be recommenced to address his current auditory hallucinations. Based upon his conversation with Landy, Blackerby understood that Parker would be held at the Hospital for several days and assumed that he would not be permitted to leave the second floor psychiatric unit.

Blackerby told Landy he would like to interview Parker and asked Landy, "Can we set this time up?" Landy agreed, and Blackerby asked what the "best time" would be. Landy replied, "Not the 6th, because [Parker] was still a little upset and had been off his medication," but agreed that the following day would be more appropriate. Blackerby told Landy that the purpose of the interview was to determine the level of dangerousness posed by Parker's threats. He further advised Landy that he would discuss the results of his investigation with the United States Attorney's Office, which would make the determination whether to arrest Parker.

On February 7, 2014, Blackerby traveled to the Hospital to interview Parker. He arrived at approximately 10:00 a.m. and met with Landy and Nurse Kimberly Dean outside Landy's second floor office. Blackerby was wearing khaki pants and a polo shirt and was not carrying a firearm. Blackerby reiterated that he was investigating Parker's threats against the President. Blackerby questioned Landy and Dean in order to ensure that Parker had "a

clear mind and [was] okay with the interview." Neither Landy nor Dean expressed reservations about Parker's ability or fitness to proceed with the interview.

Blackerby and Landy entered a conference room near Landy's office. The room was approximately eight by twelve feet in size with a table and chairs. Dean left and returned with Parker, who was not handcuffed or otherwise restrained. Blackerby introduced himself as a special agent with the Secret Service and asked Parker if he knew the purpose of Blackerby's visit. Parker responded, "yes." Blackerby informed Parker that the interview was "totally voluntary."

Blackerby sat at the head of the conference table, and Landy and Parker sat next to him on opposite sides of the table. Dean sat next to Parker on his right side, while Parker sat in the chair closest to the door, with his back to the door. During the interview, the conference room door was closed but not locked, and no security guards were present. Landy and Dean were present for the entirety of the interview, which lasted approximately one hour.

After the participants were seated, Blackerby told Parker that he had been informed that Parker had come to the Hospital the previous evening and had told the staff that he had been hearing voices directing him to kill the President. Blackerby advised Parker that he was there to investigate those threats. Blackerby did not administer Miranda warnings to Parker. Blackerby informed Parker that the interview was voluntary, that Parker was not required to talk to him and that Parker could leave at any time.

Blackerby asked Parker whether it was accurate that voices were telling Parker to kill the President, and Parker responded, "yes." Blackerby then asked Parker if he had "ever

3

thought about how [Parker] would . . . go about killing the President?" Parker provided a detailed explanation of his plan to kill the President.

Blackerby characterized Parker's demeanor as calm and cooperative and his physical appearance as slightly disheveled and tired. Parker did not fall asleep during the interview and did not appear to be intoxicated or under the influence of any drugs or medications. Parker did not raise his voice or appear angry during the interview, although his demeanor changed at one point towards the end of the interview and his eyes became fixated on Blackerby and his facial expression intensified. At that point, Blackerby asked Parker whether the voices were speaking to him, and Parker responded, "yes." Parker stated that the voices were telling him to "take [Blackerby's] gun, shoot [Blackerby] and everyone in the building." Parker told Blackerby that he heard voices instructing him to kill the President, but that his "inner thoughts [were] that he should not." Blackerby testified that he believed that Parker was suffering from an auditory hallucination.

Blackerby did not trick or mislead Parker, promise him anything, or threaten or make physical contact with him during the interview. Parker appeared to understand his questions, answered them and never requested to leave.

During the interview, Blackerby provided Parker with an "SSF 1945" form authorizing Blackerby to review his medical files and to speak with his treating physicians. Blackerby told Parker that he was not required to sign the form, but if he did so, he would be authorizing Blackerby to review his medical files and to speak with Landy about the reported threats. Parker appeared to read the form. Blackerby asked Parker whether signing the form would be "something that you would be willing to do for me," and Parker responded affirmatively and signed the form.

4

Blackerby also asked Parker if he could photograph Parker's face and scars. Blackerby told Parker that he did not have to agree, and Parker refused, stating that the voices would not permit the photographs. At the conclusion of the interview, Blackerby thanked Parker for his time, and Parker stood, opened the door and walked out of the room. After Parker left, Blackerby met with Landy and Dean to review Parker's medical files. During that meeting, Landy told Blackerby that Parker was capable of formulating a plan and that Parker tended to stop taking his medications when he was not hospitalized.

Parker's statements to Landy during the February 7 interview form the basis of the criminal charge against him.

### III. APPLICABLE LAW

Making a Threat Against the President of the United States

The Indictment charges that:

On or about February 7, 2014, in the Western District of New York, the defendant, RONNIE PARKER, did knowingly and willfully make a threat to take the life of, and to inflict bodily harm upon, the President of the United States, specifically, the defendant told a special agent of the United States Secret Service that he was going to "find him (the President) and kill him"; he would need to find the President's schedule on the internet, find a gun, then travel to where he was; he "would wait till (the President) got out of the motorcade or came to shake hands"; he "would have to kill the people around (the President) to get to him"; and he would find a gun and shoot the President if he came by today.

In order for the defendant to be found guilty of that charge, the United States must prove each of the following elements beyond a reasonable doubt:

First: that on or about February 7, 2014, the defendant said the words alleged in the indictment to be a threat to kill, and to inflict bodily harm upon the President of the United States;

Second: that the words were in fact a threat; and

Third: that the defendant made the threat knowingly and willfully.

A "threat" is a statement expressing an intention to kill or injure the President. A "true threat" is a serious threat—not idle talk, a careless remark, or something said jokingly—that is made under circumstances that would lead a reasonable person to believe that the Defendant intended to injure or kill the President. The heart of the crime is knowingly and willfully making a true threat. If the Government proves beyond a reasonable doubt that the Defendant knowingly made a true threat against the President, and intended others to understand it as a serious threat, then the crime is complete. The Government doesn't have to prove that the Defendant intended to carry out the threat.

The court in United States v. Compton, 428 F.2d 18, 21 (2d Cir. 1970), adopted the "objective" standard set forth in Roy v. United States, 416 F.2d 874, 877 (9th Cir. 1969), and wrote, "it was not necessary to establish an intention to carry out the threat." In United States v. Kelner, 534 F.2d 1020, 1025 (2d Cir. 1976), the Second Circuit wrote, "it is the utterance which the statute makes criminal, not the specific intent to carry out the threat …." See also, United States v. Carrier, 708 F.2d 77, 79 (2d Cir. 1983).

**IV.     JUDICIAL NOTICE**

Pursuant to the doctrine of judicial notice and Rule 201 of the Federal Rules of Evidence, if requested by a party, the Court must take judicial notice of any undisputed facts which are either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  Fed.R.Evid. 201.  The government may, for example, ask the Court to take judicial notice of certain undisputed facts, such as finding that Clifton Springs, New York is located within the Western District of New York, that Barack H. Obama is the forty-fourth President of the United States, and that the United States Secret Service is an agency within the Executive Branch of the federal government.

**V.     DEMONSTRATIVE EXHIBITS/SUMMARIES/AND CHARTS**

The government may use one or more demonstrative exhibits to help explain various matters to the jury.  Should this type of demonstrative exhibit be used during testimony, it would not be provided to the jury during deliberations.  The government may introduce or use at trial summaries and charts.  The government may also use some of its charts and summaries during the opening statement, the presentation of its case in chief and/or during closing argument.  These charts and summaries will substantially assist the jury in understanding the government's proof in this case.

It is well established that the trial court in its discretion may allow the presentation of summary evidence to guide and assist the jury in understanding and judging the factual controversy.  See Fed.R.Evid. 1006; United States v. Skalicky, 615 F.2d 1117, 1120 1121 (5th Cir. 1980); United States v. Cooper, 464 F.2d 648, 656 (10th Cir. 1972).  A foundation

for the admission of each chart and summary will be laid through the testimony of various witnesses, who will testify that the charts and summaries accurately reflect information contained in documents already in, or to be admitted into, evidence.  See United States v. Lemire, 720 F.2d 1327, 1349 (D.C. Cir. 1983); United States v. Pollack, 417 F.2d 240, 241 (5th Cir. 1969).  Courts have repeatedly allowed the use of charts and summaries similar to the ones the government intends to use in this case.  United States v. Stephens, 779 F.2d 232 (5th Cir. 1985) (simple flow charts tracing the defendant's use of loan proceeds); United States v. Porter, 821 F.2d 968, 974 975 (4th Cir. 1987) (summary of telephone numbers); United States v. Orlowski, 808 F.2d 1283, 1289 (8th Cir. 1986) (charts tracing the disposition of the checks generating defendant's receipts and reflecting defendant's total unreported income).  Courts allow the charts when the evidence involves numerous exhibits which are difficult to examine in court without the charts or the charts are helpful to the jury.  United States v. Stephens, 779 F.2d at 239; United States v. Scales, 594 F.2d 558, 564 (6th Cir. 1979).

**VI.    RECIPROCAL DISCOVERY**

To date, the government has provided discovery to the defense pursuant to Federal Rules of Criminal Procedure Rule 16.  Since the inception of this prosecution, the government has made available for the defense all of the items of evidence, whether intended to be used as trial exhibits or not, over which the government has custody or control.  The government has previously requested reciprocal discovery but, as of yet, has not received any materials.  Should the defendant seek to introduce any evidence that

should have been provided to the government as reciprocal discovery, the Court should exclude it under Rule 16(d)(2) of the Federal Rules of Criminal Procedure.

## VII. POSSIBLE DEFENSES

The defendant has not given notice of any defense for which the Federal Rules of Criminal Procedure require notice. Therefore, the government would move to bar any such defense if it were raised during trial.

## VIII. PRESENTATION OF WITNESSES

It is possible that the government may have to call certain witnesses out of order, or recall witnesses to testify to various events to maintain a chronological presentation. The government will strive for an orderly presentation of the evidence to assist the jury, the court, and the defendant in understanding the evidence being presented.

## IX. WITNESS EXCLUSION AND CASE AGENT DESIGNATION

The government will move for the exclusion of all witnesses until their testimony has been completed, under Federal Rules of Evidence Rule 615. The government will further move that United States Secret Service Special Agent Joel Blackerby be designated as the case agent and be exempt from the exclusion order, under Federal Rules of Evidence Rule 615. See also United States v. Perry, 643 F.2d 38 (2d Cir. 1981). The government believes he should be excepted from any sequestration order as his knowledge qualifies him as essential to counsel in understanding the case properly. See, e.g., United States v. Pellegrino, 470 F.2d 1205 (2d Cir. 1972).

## CONCLUSION

The foregoing is a summary of points the government anticipates may arise at trial. Should any legal issues arise that have not been covered in this trial brief, the government respectfully requests leave to submit such further memoranda as may be necessary.

Dated: Rochester, New York, August 21, 2015

                                                  Respectfully submitted,

                                                  WILLIAM J. HOCHUL, JR.
                                                  United States Attorney

                     By:    s/CRAIG R. GESTRING
                             Assistant United States Attorney
                             United States Attorney's Office
                             Western District of New York
                             100 State Street, Room 500
                             Rochester, New York 14614
                             (585) 399-3900
                             craig.gestring@usdoj.gov